Kunta **GRAY**, Appellant–Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A04–0609–CR–518.

Court of Appeals of Indiana.

Aug. 10, 2007.

**410**

Marshelle Dawkins Broadwell, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Kunta Gray appeals his conviction of Murder,[1] a felony, Attempted Murder,[2] a class A felony, Possession of a Firearm by a Serious Violent Felon,[3] a class B felony, and Carrying a Handgun Without a Li-

---

1. Ind.Code Ann. § 35–42–1–1 (West, PREMISE through 2007 Public Laws, approved and effective through April 8, 2007).

2. I.C. § 35–42–1–1; Ind.Code Ann. § 35–41–5–1 (West, PREMISE through 2007 Public Laws, approved and effective through April 8, 2007).

3. Ind.Code Ann. § 35–47–4–5 (West, PREMISE through 2007 Public Laws, approved and effective through April 8, 2007).

cense,[4] a class C felony. Gray presents the following restated issues for review:

1. Did the trial court err in refusing to admit into evidence the certified case chronology involving another case in which a witness who testified on the State's behalf was the defendant?

2. Did the trial court err in imposing consecutive sentences?

3. Did the failure to provide a plausible, race-neutral challenge to the striking of a juror violate equal protection principles?

4. Was the evidence sufficient to support Gray's convictions?

We affirm.

The underlying facts were set out in a previous opinion of this court, as follows:

The evidence most favorable to the judgment is that on November 16, 2000, Gray arranged to purchase a large quantity of marijuana from Greg Jones at an Indianapolis residence. Jones's friend, Avant, was at the house when Gray and an unidentified man arrived to buy the drugs. Jones retrieved a brown trash bag from his vehicle parked outside and then escorted Gray and the other man to the rear of the house, while Avant remained in the front living room area. A few minutes later, the unidentified man returned to the living room, hit Avant in the head with a handgun, and told him to get on the floor, stating, "[T]his is a robbery." Avant heard a number of gunshots from the back area of the home. Upon hearing the shots, the unidentified man stood and ran out of the house. Avant saw Gray stumble from the rear of the house and out the door. As Avant stood in or near the doorway, Gray pointed and fired his handgun at Avant, but missed. Gray and the other

man sped away in a vehicle. Jones, who had suffered a number of gunshot wounds, staggered to the front door. Avant called 911 and waited with Jones until emergency personnel arrived. Jones underwent surgery, but died twelve days later from the injuries.

The State charged Gray with felony murder, murder, robbery, attempted murder, unlawful possession of a firearm by a serious violent felon ("possession by a SVF"), and carrying a handgun without a license as a C felony. The possession by a SVF count alleged as the prior violent felony a February 1997 B felony dealing in cocaine conviction. During trial, Gray stipulated that he had been convicted of a serious violent felony within the meaning of IC 35–47–4–5.

*Gray v. State*, 786 N.E.2d 804, 805 (Ind.Ct. App.2003) (footnote and internal citation to the transcript omitted), *trans. denied.* At the conclusion of trial, a jury found Gray guilty on all charges, and the trial court entered convictions for murder, attempted murder, and possession of a firearm by a serious violent felon. Gray was also determined to be an habitual offender. The court imposed an executed sentence of ninety years—sixty years for murder, to run concurrently to a forty-year sentence for attempted murder and a twenty-year sentence for possession of a firearm by a serious violent felon, which was enhanced by thirty years as a result of the habitual offender finding. We affirmed Gray's conviction and sentence in the foregoing direct appeal.

On November 11, 2003, Gray filed a petition for post-conviction relief (PCR). The trial court denied the petition and Gray appealed. We reversed the denial of Gray's PCR petition, overturned his convictions, and ordered a new trial. *See*

---

**4.** I.C. § 35–47–2–1 (West, PREMISE through 2007 Public Laws, approved and effective through April 8, 2007).

*Gray v. State,* 841 N.E.2d 1210 (Ind.Ct. App.2006). This decision was based upon our conclusion that Gray received ineffective assistance of appellate counsel for counsel's failure to appeal the trial court's denial of Gray's request for a bifurcated trial (i.e., trying separately the charge that Gray was a serious violent felon).

In August 2006, a second jury trial was conducted and Gray was again found guilty on all counts.[5] He was sentenced to thirty years for attempted murder, ten years for carrying a firearm by a serious violent felon, and four years for carrying a handgun without a license, with those sentences to run concurrently with one another and consecutive to the fifty-five-year sentence imposed for the murder conviction. Thus, Gray received an eighty-five-year executed sentence.

### 1.

■ Gray contends the trial court erred in refusing to admit into evidence a certified copy of the Chronological Case Summary (CCS) for a different criminal case involving a person who testified on the State's behalf.

Gray frames this issue in terms of the exclusion of evidence. This mischaracterizes the decision in question. The background facts are that Andrew White claimed Gray had confessed to him (White) that he (Gray) robbed and killed Jones. According to White, this occurred in the City–County Building, while White was there awaiting a jury verdict in a case in which he was the defendant, and Gray was there for a pretrial conference. In anticipation of White's testimony, and before he was called to the witness stand, defense counsel advised the court that she would be asking it to take judicial notice of the court's record in White's criminal case. According to counsel,

The facts are that—that he [i.e., White] was not taken back until 11:00—until 23:42, Your Honor, which is about 18 minutes of midnight. . . . That's when he was remanded back to the custody of the—of the Sheriff—in other words that's when his proceedings concluded, not 9:00 [as White had claimed]. So, therefore, if the jury was out four hours [as White had claimed] the argument would be that the jury went out and began deliberating no earlier than 7:00 p.m. which makes it even more incredible or less likely that Mr. Gray would have been back there sitting in the holding tank with him while Mr. White's jury is out. That—he is certain—we nailed him down on several times it happened during—during during jury deliberations.

*Transcript* at 443–44.

In a nutshell, defense counsel sought, via judicial notice, the introduction of the CCS in White's case to show that White had no opportunity to speak with Gray on the day when he claims Gray confessed to him that he had killed Jones. The State objected to the appropriateness of judicial notice in this instance because it would not establish what defense counsel hoped to establish and, further, would be confusing to the jury. Ultimately, the court agreed that it was questionable "whether or not the times punched into the case chronology actually reflect when the event took place or when somebody had the opportunity to sit down and enter it into the computer." *Id.* at 446. In explaining its decision, the court stated, "But you're not asking to put the record into evidence, you're asking me to take judicial notice of a fact, and I cannot instruct the jury in good conscious [sic] that the record shows that Mr. White was taken back at X time based on that

---

5. The habitual offender count was dismissed after trial at the State's request.

case chronology." *Id.* at 447. Gray claims he "should have been allowed to introduce the document." *Appellant's Brief* at 12.

█ Ind. Rules of Evidence 201(a)(2) states, in relevant part, "A court may take judicial notice of a fact. A judicially-noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." This provision has been interpreted to permit judicial notice of court records, which presumably would include a chronological case summary. *See Brown v. Jones,* 804 N.E.2d 1197 (Ind.Ct.App.2004), *trans. denied.* "Nevertheless, notice of court records is not without limitation." *Id.* at 1202. Except for situations involving claim preclusion, "judicial notice should be limited to the fact of the record's existence, rather than to any facts found or alleged within the record of another case." *Id.*

█ In this case, Gray did not seek, via the CCS, judicial notice to establish the fact of White's case. Rather he sought judicial notice of certain facts found in the record of that case, i.e., what time jurors began deliberating, what time they returned with a verdict, and ultimately, what time Gray was in the holding cell. As the State's and trial court's comments indicated, the times listed on the CCS do not necessarily reflect what times those events occurred; neither do they reflect the times that White was confined in the holding cell. Therefore, they were properly excluded upon several bases. First, although it is undisputed that the CCS reflects certain times for certain events, the accuracy of the times provided is not indisputable; therefore, the facts Gray sought to prove thereby were in dispute as well. Second, it appears that Gray's request went beyond judicial notice merely of the fact of White's CCS, but extended impermissibly

to facts found or alleged within the record of White's case. *See Brown v. Jones,* 804 N.E.2d 1197. Finally, the ruling that Gray sought here is, at best, inconsistent with the general rule that a trial court may not take judicial notice *even of its own records* in another case previously before the court on a related subject with related parties. *See id.* (citing *Henderson v. State,* 544 N.E.2d 507 (Ind.1989)).

The trial court did not err in refusing Gray's request for judicial notice.

### 2.

Gray contends the trial court erred in imposing consecutive sentences for the murder and attempted murder convictions. Following the first trial, Gray's sentences for murder and attempted murder were ordered to run concurrently. When those convictions were overturned and Gray was again convicted and sentenced for those two offenses at a second trial, the sentences were imposed consecutively. Gray contends the trial court violated his due process rights by imposing those sentences consecutive to one another after they were first imposed concurrently.

█ Gray challenges consecutive sentences only on the above basis. In support of this claim, he cites Ind. Post–Conviction Rule 1(10)(b), *Ogburn v. State,* 549 N.E.2d 389 (Ind.Ct.App.1990) and *Hull v. State,* 839 N.E.2d 1250 (Ind.Ct.App.2005). P.-C.R. 1(10)(b) states:

> If a sentence has been set aside pursuant to this rule and the successful petitioner is to be resentenced, *then the sentencing court shall not impose a more severe penalty than that originally imposed* unless the court includes in the record of the sentencing hearing a statement of the court's reasons for selecting the sentence that it imposes which includes reliance upon identifiable conduct on the part of the petitioner that oc-

curred after the imposition of the original sentence, and the court shall give credit for time served.

(Emphasis supplied.) *Hull* and *Ogburn* provide examples of the application of the forgoing provision. Citing this authority, Gray contends the trial court erred in the instant case because, in imposing consecutive rather than concurrent sentences, it did not set forth identifiable conduct on his part that occurred *after* the imposition of the original sentence. We conclude the sentence here imposed does not implicate P.-C.R. 1(10)(b).

The provisions of P.-C.R. 1(10)(b): (A) apply when a defendant's conviction has been reversed in a previous appeal and a retrial resulted in conviction of the same charges; (B) forbid a greater sentence for the subsequent conviction unless the court explains why it imposed a greater sentence following the second trial; and (C) require that said explanation cite behavior on the defendant's part that post-dated the time of the first sentencing. Clearly, condition (A) is met, as Gray appeals a conviction following a second trial after convictions following a first trial were reversed. Condition (B), however, is not met because the trial court did not impose a greater sentence here than in the first trial.

Gray contends the instant sentence is greater because the two terms in question were imposed consecutively, not concurrently. Although we find no case directly on point, cases discussing related issues have not defined "increase" in this manner. In *Williams v. State,* 494 N.E.2d 1001 (Ind.Ct.App.1986), *trans. denied, cert. denied,* 481 U.S. 1054, 107 S.Ct. 2191, 95 L.Ed.2d 846 (1987), the defendant was sentenced to ten years for the underlying conviction, which was enhanced by thirty years based upon a habitual offender finding. The defendant successfully challenged the validity of the habitual offender finding and sentence enhancement. The trial court vacated the habitual offender finding and the entire forty-year sentence. Upon resentencing, the court imposed the presumptive term of ten years enhanced by two (2) years for aggravating circumstances. The defendant argued that the new sentence violated due process—essentially one of the main arguments Gray makes in the instant case. The court rejected that argument in *Williams,* indicating among other things that the measure of "increase" in such cases focuses on a comparison of the aggregate sentences, not the individual components of the aggregate sentences ("[t]he result was, in fact, a lesser sentence than Williams had before (twelve years versus forty years)"). *Id.* at 1004. *Cf. also Kelly v. Neubert,* 898 F.2d 15, 16 (3rd Cir.1990) ("a restructuring of a sentence does not trigger the [*North Carolina v.*] *Pearce* [395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)] rule when the aggregate sentence is less than that originally imposed and there is no evidence of vindictiveness on the part of the sentencing court"). We also note in *Kelly* a persuasive rationale for adopting this view, viz.:

When a defendant is convicted of more than one count of a multicount indictment, the district court is likely to fashion a sentencing package in which sentences on individual counts are interdependent. When, on appeal, one or more counts of a multicount conviction are reversed and one or more counts are affirmed, the result is an "unbundled" sentencing package. Because the sentences are interdependent, the reversal of convictions underlying some, but not all, of the sentences renders the sentencing package ineffective in carrying out the district court's sentencing intent as to any one of the sentences on the affirmed convictions.

*Id.* at 17 (quoting *United States v. Shue,* 825 F.2d 1111, 1114 (7th Cir.1987), *cert. denied,* 484 U.S. 956, 108 S.Ct. 351, 98 L.Ed.2d 376).

■ Consistent with the foregoing authorities, we conclude that for purposes of P.-C.R. 1(10)(b), "more severe penalty" as used in that statute refers to the aggregate sentence, not its component parts. In the instant case, the trial court imposed an eighty-five-year sentence following the second trial, which was five years less than the sentence imposed following the first trial. Even considering the fact that the second sentence did not include an habitual offender enhancement and assuming for the sake of argument that P.-C.R. 1(10)(b) applied, there is no evidence that the trial court was motivated by vindictiveness. Rather, the similarity of the two sentences reflects what the *Shue* court referred to as a general sentencing intent.

### 3.

Gray contends the trial court's failure to provide a plausible, race-neutral challenge to the striking of a juror violated his equal protection rights.

■■ When a *Batson* claim is made, the defendant must first make a prima facie showing that the prosecutor exercised peremptory strikes based on race. *Hardister v. State,* 849 N.E.2d 563 (Ind. 2006). "A prima facie showing requires the defendant to show that peremptory challenges were used to remove members of a cognizable racial group from the jury pool and that the facts and circumstances raise an inference that the removal was because of race." *Id.* at 576. After such a prima facie showing is made, the burden shifts to the prosecution to provide a race-

neutral explanation. *Hardister v. State,* 849 N.E.2d 563. In *McCormick v. State,* 803 N.E.2d 1108 (Ind.2004), our Supreme Court adopted the "tainted" approach to reviewing *Batson* challenges. The Court explained that approach as follows: "In simple terms, '[r]egardless of how many other nondiscriminatory factors are considered, any consideration of a discriminatory factor directly conflicts with the purpose of *Batson* and taints the entire jury selection process.'" *Id.* at 1113 (quoting *Arizona v. Lucas,* 199 Ariz. 366, 18 P.3d 160, 163 (App.2001), *cert. denied,* 534 U.S. 1014, 122 S.Ct. 506, 151 L.Ed.2d 415).

■ In the instant case, defense counsel challenged the State's dismissal of four African–American prospective jurors as racially motivated. The State responded as follows:

First of all, Judge, I'd like to say that I don't believe that there's been a prima facia [sic] case (of improper striking) shown. We did leave three[6] African–Americans on. I'd also like the record to reflect that the Defense struck African–Americans that the State did not. Mr. Simmons [the first disputed, dismissed African–American juror] is a convicted felon and served time in the Department of Corrections. That's the reason that the State struck him. Miss Hunt [the second disputed African–American juror dismissed by the State], it was definitely not because she's African–American. I loved every answer that she gave. The reason [she] was struck, however, is because of her employment with FSSA, and as this court is aware, our office has charged and has investigated a lot of people who work for the FSSA, and we were very worried that she would hold that against the

**6.** The record reflects a discrepancy as to whether there were two or three African–

American members on the jury.

State of Indiana. As for Mr.—Mr. Beckam [the third disputed African–American juror dismissed by the State]—Mr. Beckam would not directly answer why he could not be a fair and impartial juror, Miss McCoy asked him more than one time—I believe three or four times, and he wouldn't give her a straight answer. He also then went on to discuss why some people might not be able to judge other people based on religion. And although, he said that he—that wasn't him, it was just we felt it was very odd that he would bring that up, if it didn't apply to him, which is why we struck him. And Mr. Gilbert [the fourth disputed African–American juror dismissed by the State], when I was discussing the possibility that he might hear some witnesses who may or may not be doing things that he liked, he indicated—I asked him if he would discount completely, and it took me four or five times before he finally said no, he (indiscernible), and I was under the impression that yes, actually he would discount them completely. He also did not answer on this questionnaire yes or no—where [sic] he could be fair and impartial and those are the reasons we struck them.

*Transcript* at 51–53 (footnote supplied).

In reviewing the above comments, we discern no racial motivation on the State's part in striking the jurors in question. To the contrary, the State provided plausible, race-neutral reasons for striking each of the jurors in question, and nothing more. Moreover, we note that at least two African–Americans were seated on the jury. *See Hardister v. State*, 849 N.E.2d 563 (standing alone the removal of some, but not all, African–American jurors by peremptory challenge does not raise an inference of discrimination). The trial court did not err in denying Gray's *Batson* challenge.

4.

Gray contends the evidence was not sufficient to support Gray's convictions. Specifically, Gray contends his convictions are primarily based upon Avant's testimony, which Gray claims was incredibly dubious. Gray summarizes the nature of his argument as follows:

Avant's testimony is inherently improbable and is the only direct evidence which placed Gray at the Tallman house at the time of Jones' death. It is the only evidence of the attempted murder charge. Avant's lies with respect to his use of marijuana on the date of the shooting, his changing versions of events, his unreliable identification and his cagey responses with respect to his location at the time of Jones' shooting leaves his testimony incredibly dubious and the evidence insufficient to support Gray's convictions on each count.

*Appellant's Appendix* at 23–24.

When reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge witness credibility. *Clay v. State*, 755 N.E.2d 187 (Ind.2001). We consider the evidence and the reasonable inferences to be drawn therefrom supporting the verdict and will affirm if evidence of probative value exists from which a jury could find the defendant guilty beyond a reasonable doubt. *Id.*

Gray seeks to invoke the incredible dubiosity rule. "Within the narrow limits of the 'incredible dubiosity' rule, a court may impinge upon a jury's function to judge the credibility of a witness." *Love v. State*, 761 N.E.2d 806, 810 (Ind. 2002). For testimony to be disregarded based on a finding of "incredible dubiosity," it must be inherently contradictory, wholly equivocal, or the result of coercion. *Love v. State*, 761 N.E.2d 806. Moreover,

there must also be a complete lack of circumstantial evidence of the defendant's guilt. *Id.* This rule is rarely applicable. *Id.*

 We find that the incredible dubiosity rule does not apply here. We note first there was not a complete lack of circumstantial evidence. Among other things, earlier on the day of the incident, Gray first approached Jeffrey Taylor and asked about purchasing a large quantity of marijuana. Taylor went down the street to the house of Jones, who was a known drug dealer, and informed Jones of Gray's request. Jones told Taylor to bring the men to his (Jones's) house. Taylor did so. At the second trial, Taylor testified that he had driven Gray to Jones's house earlier on the day of the murder, that Jones and Gray had reached an agreement concerning a drug deal, and the Gray was to return to Jones's house later to complete the deal. Taylor's description of the car Gray was driving earlier in the day was consistent with Avant's description of the car in which the shooter and his accomplice drove from the scene after the shooting. Also, Jones's fiancé was arriving at Jones's house as the assailants were leaving just after the shooting, and she testified that she saw a car matching that same description speeding away from the scene. Moreover, Gray overstates the extent and scope of the internal inconsistencies inherent in Avant's testimony. To the extent such inconsistencies existed, they were brought to the jury's attention during closing argument by Gray's counsel. Those inconsistencies were matters to be considered by the jury in assessing Avant's credibility and we will not invade its province in that regard. The evidence was sufficient to support the convictions.

Judgment affirmed.

BAKER, C.J., and CRONE, J., concur.