**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 14 2012, 8:55 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARCE GONZALEZ, JR.,**
Dyer, Indiana

ATTORNEYS FOR APPELLE

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANTONIO D. JONES, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  45A03-1111-CR-00496 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Thomas P. Stefaniak, Jr., Judge
Cause No. 45G04-0401-MR-00003

**September 14, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant Antonio D. Jones appeals his convictions for four counts of Felony Murder.[1] Specifically, Jones contends that hearsay evidence was erroneously admitted at trial, that his right to confront witnesses against him was violated, that he was prevented from presenting evidence of bias and retaliation against him by one of the witnesses, and that the evidence was insufficient to support the convictions. Concluding that the trial court did not admit improper hearsay evidence and finding no other error, we affirm the judgment of the trial court.

FACTS

On January 16, 2004, at approximately 6:00 p.m., Ronyale Hearne dropped off her twenty-three-month-old son, A.J., at the home of his father, Anthony McClendon, Sr., on Polk Street in Gary. McClendon lived at the residence with Laurice and Jimmy Jones (collectively, the Joneses).

Hearne and her cousin, Donte Mills, returned to the residence on Polk Street to get A.J. shortly after midnight. She went upstairs, the door was open, and she saw Laurice on the couch "like she could be dead." Tr. p. 382-84. Hearne called McClendon's brother, Roosevelt Pickens, who arrived at the scene shortly thereafter. She walked further into the apartment and saw Jimmy's body on the bathroom floor. She then saw Pickens standing over McClendon and holding A.J. It appeared as if McClendon's "whole face was just blown open." Id. at 389.

---

[1] Ind. Code § 35-42-1-1.

Hearne took A.J. from Pickens and ran downstairs. Mills drove A.J. and Hearne to Northlake Hospital. At some point, Hearne pulled up A.J.'s shirt and noticed that he had a hole in his side. A.J. was eventually transported to the University of Chicago Hospital by ambulance. It was determined that A.J. had suffered two gunshot wounds that had passed through his body. A.J. later died from his wounds.

Pickens telephoned his friend, Terrell Bowens, upon arriving at the scene. Bowens went to the apartment, contacted the police, and waited approximately ten minutes for their arrival. At the residence, the police saw the bodies of McClendon and the Joneses and also discovered scales and powder cocaine on the kitchen counter as well as cocaine cooking on the stove.

During the investigation, the police were able to determine that three different types of firearms were used in the murders. Autopsies performed on McClendon and the Joneses revealed that all three had died from multiple gunshot wounds.

On January 16, 2004, Maurice Fuller and Anita Goldsby held a party at their apartment in Gary that started around 7:00 p.m. There were about twenty people at the party, and James Parks, Lenzo Aaron, and Jones were there and playing cards for money. At some point, Fuller bumped into Jones in the kitchen. The two were "joking around," and Jones lifted up his shirt and revealed the butt of a gun. Tr. p. 1159-60. Jones said, "You don't want none of this." Id. Fuller described Jones's handgun as an automatic, "like a 9mm or a .45." Id. at 1160.

While the three were playing cards at the party, Aaron and Parks got into an argument over some money. Jones was Aaron's partner in the card game. The argument was settled, and Aaron told Parks to keep the money in dispute. At some point, Jones walked into the kitchen and said, "We just got a call from some dude . . . do you want to go rob him?" Id. at 1198. Jones said that the caller had $6000 and some drugs in his possession. Aaron and Parks both agreed to rob the caller, and Parks and Jones left. However, they returned to pick up Aaron, and the three then left again in Jones's white Buick Roadmaster to commit the robbery. By this point, Aaron had seen the butt of the black semi-automatic handgun tucked into Jones's waist. An AK-47 assault rifle was also on the backseat of Jones's vehicle.

When the three arrived at the Polk Street residence, Jones went in first, followed by Parks and then Aaron. Aaron was carrying the AK-47 rifle. After the three went up the stairs, Jones knocked, someone came to the door and asked who was there, and Jones replied, "It's Tone." Id. at 1210. As soon as the person inside opened the door, someone fired five or six shots. After the three entered, Aaron saw Laurice and A.J. on the couch. Parks and Jones had gone to the back of the residence, and at some point, Aaron heard Parks say, "Where the sh*t at, man?" Tr. p. 1211. The man he was talking to responded, "Tone, James G. It's like this man? It's like this?" Id. at 1216. Laurice was pleading with Aaron, "Please, sir, don't kill me. Please don't kill me." Id. at 1213. Aaron shook his head to indicate he was not going to harm her. However, Aaron, who was unable to see into the back of the apartment because a sheet was hanging in the doorway, heard

4

Parks say, "Finish him off. Finish him off." Id. at 1216. The others returned to the living room and grabbed the AK-47 off Aaron's shoulder. Thereafter, they went to the rear of the apartment and Aaron heard two more shots.

Jones left, while Aaron and Parks remained in the living room. Parks told Aaron, "Finish the lady off, man." Tr. p. 1216. Aaron told Parks, "Man I didn't come here for that, I ain't killing nobody," then left the apartment. Id. at 1217. As Aaron was leaving, he heard two more shots. Id.

Aaron did not take anything from the apartment, nor did he see Parks or Jones take anything. However, he was originally told that they were going to steal $6000, with each of them to take $2000 from the robbery. Thereafter, Jones drove the three to the Oak Knoll apartments. Sometime after 12:50 a.m., Jones called Janeth Alexander for a ride, explaining that he had lost his keys. When Alexander arrived, Jones's vehicle was outside. After Alexander picked him up, and they were driving along a drainage ditch on Chase Street, Jones asked her to stop the vehicle. However, Alexander refused because the weather was bad. Jones said he had been drinking, and Alexander thought that he appeared to be "hot or sick." Tr. p. 1659. Jones rolled the window down, and she heard "something go off—you know, hit the water." Id. Jones turned around and asked her, "you didn't see that, did you?" Id. Jones had tossed the gun into the water.

After Jones was arrested, he called Alexander from the jail. Jones told her that she was his alibi, and that his life was in her hands. After Alexander testified in another proceeding, Jones called her and said that he was going to kill her.

5

The day after the murders, Parks knocked on Aaron's door, gave him $230, and asked him, "was [he] straight," which Aaron took to mean, was he "cool with the $230." Tr. p. 1232. Aaron feared for his life and that of his girlfriend, so he accepted the $230. Id. at 1233-34.

Meanwhile, on January 19, 2004, Detective Michael Jackson talked to Jeffrey Lewis, Parks's brother, about the incident on 2600 Polk, but Lewis did not identify himself at that time. Detective Jackson spoke again with Lewis on January 20, 2004, and for the first time in person on January 21, 2004. Lewis provided a written statement. Detective Jackson spoke with Lewis several times thereafter. Lewis knew that Parks had an AK-47 and that Parks had obtained the rifle through Shawn Dixon. He had seen Parks with the AK-47 and also described to Detective Jackson a .22 caliber weapon that Parks had obtained from a person named "Hype." Tr. p. 975-76, 986. Lewis had also seen Jones with a .45 caliber weapon on his lap before the night of the murders.

Based on information that Lewis had provided, police officers were instructed to go to three separate locations to conduct surveillance on Parks, Aaron, and Jones. Search warrants were issued that culminated in ten searches, which included the residences of Aaron, Dixon, Parks's father, Parks's cousins' home, the address where Jones allegedly resided, and Parks's girlfriend's home. Police also searched the home of Jones's girlfriend, Teshonta Champion.

Fuller had known Parks for almost six years and had gone to a gun store with him to purchase the AK-47. However, they were unable to make the purchase. Instead,

Dixon went to the store and made a down payment on the weapon. Dixon purchased the rifle for Parks, who paid Dixon the money for the gun.

The AK-47 was later fired at Brandy Parks's house at the Oak Knoll Apartments on New Year's Eve. The police subsequently found nine shell casings from a 7.62 x 39 mm weapon at the quadruple murder scene. This caliber of ammunition is fired from AK-47 and AK-47 copy-type firearms. It was determined that they all had been fired from the same weapon. The police also found eighteen 7.62 x 39 mm casings near Dixon's house, all of which had been fired from the same weapon. These, in turn, were fired from same weapon that fired the nine rounds found at the Polk Street residence. The police also found seven more 7.62 x 39 mm cartridge casings, collected from Brandy's residence. Those rounds were also fired by the same weapon that fired the 7.62 x 39 mm rounds at the Polk residence.

On January 26, 2004, Aaron was arrested, and Parks was arrested the next day. On the same day, Jones entered the police station and stated that some detectives from Gary were looking for him. Jones was also placed under arrest.

When Aaron was asked about the incident on Polk Street, he requested legal counsel, and the questioning ceased. Aaron later asked to talk with Detective Richardson, and he provided a formal written statement on January 28, 2004. Aaron implicated himself in the murders on two occasions and was initially charged with four counts of murder. Aaron subsequently entered into a plea agreement on May 6, 2004, which called for him to plead guilty to four counts of class A felony robbery. It was an

open plea, pursuant to which Aaron would be sentenced within a range of twenty to fifty years for each count, to be served concurrently. As a term of the plea agreement, Aaron agreed to cooperate with the police.

On January 29, 2004, Jones was charged with four counts of felony murder. Following a jury trial on May 17, 2004, Jones was found guilty as charged, and was subsequently sentenced to 240 years of incarceration. We affirmed Jones's conviction on direct appeal, and he subsequently petitioned for post-conviction relief. Following a hearing on February 26, 2007, the post-conviction court denied his request for relief on September 11, 2007. After we affirmed the denial of post-conviction relief, Jones petitioned for a writ of habeas corpus on February 13, 2009. The district court denied Jones's request for relief, finding that Jones had failed to establish a violation of due process with respect to the admission of the challenged statements and determining that we had reasonably found any error to be harmless.

However, on March 31, 2011, the United States Court of Appeals for the Seventh Circuit reversed the district court's holding with regard to the propriety of the hearsay statements that were admitted. As a result, Jones was ordered to be released if he was not tried within 120 days of the mandate. Jones v. Basinger, 635 F.3d 1030 (7th Cir. 2011). Jones was retried on four counts of murder, and a jury found him guilty as charged. Jones was subsequently sentenced to four consecutive sixty-year terms of incarceration, and he now appeals.

8

## I.  Hearsay Evidence

Jones claims that the trial court improperly permitted Lewis to testify about statements that were made to Lewis by James Parks, Lewis's brother.   Jones claims that the admission of that testimony violated his right to confront witnesses against him under the Sixth Amendment to the United States Constitution.

In addressing this contention, we first note that <u>Jones v. Basinger</u>, the appeal from the federal district court that originally denied Jones relief on his habeas corpus petition, reversed the federal district court and determined that we did not properly apply the rule announced in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), to the facts of Jones's first trial.  635 F.3d at 1050-51.

In Jones's direct appeal from his first trial, we discussed the applicability of <u>Crawford</u> regarding a defendant's right to confront witnesses against him and found that Jones's rights were not violated because the detectives' testimony was not hearsay and had not been offered as substantive evidence.  <u>Jones v. State</u>, No. 45A03-0407-CR-339, (Ind. Ct. App. June 30, 2005).  The facts from Jones's first trial that prompted the grant of the writ of habeas corpus from Jones's first trial were set forth by the Seventh Circuit as follows:

> Detective Jackson met with Lewis the next day, and Lewis told Jackson "who committed the [shooting], what took place, the type of weapons that they used, and where all of these individuals were or lived."  Specifically, Lewis claimed that his brother James Parks had confessed to Lewis that he, Aaron, and Jones had committed the four murders. According to Lewis,

9

Parks had told him that the three men were at a party together before going to rob McClendon's apartment. Lewis also said that his brother had supposedly told him the motive for the robbery: Jones "needed the money to pay his rent."

Lewis also told the police that Parks had provided a number of specific details about the shootings. The men had gained entry into McClendon's apartment, Lewis said, by simply knocking and asking to be let in. Once inside, Lewis told the detectives, Jones declared that "they couldn't leave any witnesses," and Parks told Aaron to "finish off" Laurice Jones. Lewis also said that his brother had told him that Jones and the others had made off with "a large sum of money [from] the residence."

Lewis said the murder weapons were a .22-caliber handgun, a .45 - caliber handgun, and an AK-47 assault rifle, and he provided descriptions of the .45-caliber and the AK-47. A man named Shawn Dixon had purchased the AK-47 for Parks, and Lewis had seen Jones with the .45-caliber "a lot of times." According to Lewis, Parks still had the AK-47, but the handguns had been discarded in a "swampy area" or waterway near Chase Street in Gary. This detailed and damning double-hearsay was allowed despite repeated objections by the defense, always on the theory that it was showing only the "course of the investigation" and responding to Jones' defense that the only (admissible) evidence linking him to the crimes came from Aaron pursuant to his generous plea agreement.

Jones, 635 F.3d at 1037.

The Seventh Circuit also alluded to the deputy prosecutor's use of Lewis's out-of-court statements in closing argument, specifically pointing out that the State bolstered Lewis's credibility by offering an altruistic motive on Lewis's part for contacting the police. Id. at 1037-38. In other words, the Seventh Circuit found that the use of Lewis's out-of-court statements were not offered simply to show the course of the police investigation and that Jones's right to confront witnesses against him was violated as

10

announced in Crawford. Therefore, the Seventh Circuit granted a conditional writ of habeas corpus, meaning that the State was required to release Jones unless it retried him within 120 days. Jones, 635 F.3d at 1056.

Following the issuance of the writ, a new trial commenced with different facts and circumstances, and Lewis provided no testimony, nor did any other witnesses testify to anything said by Lewis to them that communicated any statement made to Lewis by Parks. Even though Jones presents a discussion as to how an out-of-court statement could be offered to show a course of investigation and not be inadmissible hearsay, he does not point to any out-of-court statement that was impermissibly used as substantive evidence in his new trial. Appellant's Br. p. 7. Instead, Jones is apparently arguing that simply letting the jury know that Lewis is Parks's brother is the equivalent of an out-of-court statement. Lewis provided no testimony, nor did any other witnesses testify to anything said by Lewis to them, that communicated any statement made to Lewis by Parks. In short, the record is devoid of any out-of-court statements by Parks that Jones was unable to confront through cross-examination.

An out-of-court statement may be admissible to show the steps that a police officer took during an investigation. Cockrell v. State, 743 N.E.2d 799, 805 (Ind. Ct. App. 2001). However, such testimony must be limited to describing the course of the police investigation and may not be offered to prove the truth of the matter asserted. Id. When the admissibility of an out-of-court statement received by a police officer during the course of an investigation is challenged as hearsay, we first determine whether the

11

testimony describes an out-of-court statement that asserts a fact susceptible of being true or false. Vertner v. State, 793 N.E.2d 1148, 1151 (Ind. Ct. App. 2003). If the statement contains no such assertion, it cannot be hearsay, and the objection should be overruled. Id. If the statement does contain an assertion of fact, we consider the evidentiary purpose of the proffered statement. Id. If it is to prove the fact asserted, is not from a witness or a party, and there are no applicable hearsay exceptions, the statement is inadmissible hearsay. Id. If the statement is offered for a purpose other than to prove the truth of the matter asserted, we consider whether the fact to be proved is relevant to some issue in the case and whether the danger of unfair prejudice that may result from its admission outweighs its probative value. Id. This analysis is performed where the testimony is admissible because it merely describes the course of police investigation. Hernandez, 785 N.E.2d at 298.

In this case, the record shows that the trial court took steps to ensure that there would be no repeat of the double hearsay that was recognized by the Seventh Circuit Court of Appeals to have violated Jones's right of confrontation in the first trial. Expressly citing the Seventh Circuit's opinion, the trial court granted Jones's motion in limine that sought to exclude hearsay testimony from Lewis about what Parks told him. Tr. p. 41-42.

During the second trial, we note that the trial court also properly overruled Jones's objection to the deputy prosecutor's opening statement that the police had received a telephone call from Lewis that he was Parks's brother and that police placed surveillance

12

on Parks and Jones based on information that had been received from Lewis. Id. at 302-03, 307, 311, 315-22. The trial court read verbatim relevant portions of the Seventh Circuit's habeas opinion into the record, "[n]oting that [a course of investigation exception to hearsay] may apply if a jury would not otherwise understand why an investigation targeted a particular defendant." Id. at 318. The trial court quoted further from the habeas opinion in explaining its ruling on Jones's motion when it was stated, "[a]nd I am going to quote this again because it is determinative and conclusive on the current Motion before the Court. . . . The State is doing exactly what the United States Court of Appeals 7th Circuit opinion says it should do. Motion for Mistrial denied." Id. at 322. It is apparent that the trial court was carefully protecting the record from any out-of-court statements that would deprive Jones of his right of confrontation.

Unlike the previous trial, there was no hearsay offered in this trial from Lewis, let alone the double hearsay considered by the Seventh Circuit, that violated Jones's right to confront witnesses against him. Rather, the State presented testimony that Lewis was Parks's brother, that Lewis talked with police, and that the police directed their investigation in particular avenues based on what they had learned from Lewis. Tr. p. 1057-61. Because the jury was not provided with any out-of-court statements from Parks through Lewis's testimony or officer testimony, i.e., the type of double hearsay that was problematic in the former trial, there was no hearsay or Confrontation Clause violation in this instance.

By way of illustration, we note that when Jones was retried, Lewis was incarcerated following a conviction on a federal gun charge. Tr. p. 929. Lewis testified that he is Parks's older brother and that he was living with his sister, Brandy, in "some projects" on 21st Street in Gary in 2004. Id. at 961-62. Lewis testified that he knew Jones by the nickname "Tone," and he knew Aaron as "Thirst." Id. at 963. Lewis also acknowledged that he knew McClendon and Hearne. Id. at 999, 1000.

On direct examination, Lewis testified that he did not remember having seen his brother with a weapon before January 16, 2004. Id. at 964. Lewis was afforded the opportunity to review the deposition testimony that he gave on August 24, 2011, and afterward he claimed he did not remember giving the responses in the deposition. Id. at 965.

The deputy prosecutor read the deposition into the record, and the trial court admitted it as substantive testimony. Id. at 975, 976, 986, 987, 1021. None of the deposition testimony related to statements made to Lewis by Parks. Rather, it revealed that Lewis knew Parks had an AK-47, knew that Parks obtained the rifle through Shawn Dixon, had seen Parks with the AK-47, and had described a .22 caliber weapon that Parks got from a person named "Hype." Tr. p. 975, 976, 986. The testimony also revealed that Lewis had seen Jones with a .45 weapon on his lap prior to the night of the murders. Id. at 987.

Moreover, evidence from independent sources, including the testimony of Fuller, also established that Jones was carrying a handgun in his waistband at the party that

14

roughly fit the description of the gun that Lewis described seeing on Jones's lap before the night of the murders. Tr. p. 1159-60. Fuller and Dixon also testified about purchasing the AK-47 for Parks. Id. at 1150-51, 1488-89, State's Exs. 211, 212. They also testified about firing that weapon at Dixon and Parks's home, and Fuller testified that Lewis was there when the weapon was fired at Brandy's. Id. at 1152, 1497-98. This evidence refutes the notion that Lewis possessed information relevant to the investigation that could only have been gleaned through statements from his brother. Instead, they show that Lewis possessed information through personal observation and association with others subject to the investigation. For all of these reasons, we conclude that the trial court did not admit improper hearsay evidence at trial, and Jones has failed to demonstrate that his right to confront witnesses against him was violated.

## II. Exclusion of Hearsay Evidence Regarding Alleged Bias of Aaron

Jones next argues that the trial court erred in excluding evidence of bias that was relevant to his defense. More specifically, Jones points out that he made an offer of proof demonstrating that Aaron had implicated Jones in the killings as retaliation for Jones's prior testimony in an unrelated federal case against Aaron's friend that resulted in a conviction.

At the outset, we note that the admission or exclusion of evidence is a matter left to the sound discretion of the trial court, and we will reverse only upon an abuse of that discretion. Corbett v. State, 764 N.E.2d 622, 627 (Ind. 2002). In Jones's offer of proof, he testified that he had been a co-defendant with Kevin Wash in a 1999 federal drug case.

15

Tr. p. 2036. According to Jones, he cooperated with the government and testified against Wash. Id. at 2037. Wash was convicted and sentenced. Id. Jones said Wash was facing from ten years to life in prison, and Jones received four and one-half years as a benefit from his cooperation. Id. at 2037.

Jones testified that immediately after his release from prison in 2002, he was leaving his sister's home when he was approached by Aaron. Id. at 2038, 2040. Jones claimed that Aaron told him that he "knew what I did, talking about [Wash]," and Jones replied that "he should have told you what he did," then got in the car and left. Id. at 2039. Jones claimed that Aaron then remarked that "[y]ou gonna get what you got coming to you." Tr. p. 2039.

In a subsequent offer to prove, Aaron testified that he knew Wash from school, that they played baseball together, and that they had known one another since Aaron was seven or eight years old. Id. at 1266. Aaron knew that Wash had been charged in 1999 with several other defendants in a federal drug case. Tr. p. 1266. Aaron did not know that Jones had testified against defendants in that prosecution. Moreover, he denied that he threatened any revenge against Jones for any such testimony. Id. at 1267. Aaron said he first became aware that Jones and Wash had been charged together during Jones's first trial through his attorney. Id. at 1268.

The trial court reaffirmed its order in limine regarding this proffered testimony, finding that the evidence showed that Aaron and Jones had interacted amicably at the party before the murders and that Jones failed to show a reasonable degree of probability

16

that Jones was biased against him because of this alleged testimony against Wash. Tr. p. 149, 2042.

At some point, trial counsel for Jones told the trial court, "Excuse me, Your Honor, we are almost through with this witness, I'm asking no questions regarding Kevin Wash, there is no need for litigation or anything to come in, I understand the Court's ruling." Id. at 2033. "I don't see a need to get into the Kevin Wash issue." Id. at 2034. When the trial court asked if Jones was waiving his right to testify on particular issues, trial counsel responded, "Not waiving it, I'm being precluded and I'm going to follow the Court's order." Id.

Also, while we note that counsel did make an offer to prove when invited by the trial court, counsel indicated that the only evidence he had to offer was hearsay and that "he [could] not use it." Tr. p. 2035. Moreover, after making the offer of proof, Jones's counsel stated the following:

> From this examination, it would appear that at this point in time, there would be no impeachment possible of Mr. Lenzo Aaron since the question, "Do you even know Kevin Wash?" Let alone any subsequent encounter with my client, would not have come out. So I don't think I can use it because anything he says would be hearsay. And Mr. Lenzo [sic] is not—well I guess he's a defendant, but he's a witness in this case. I don't see an exception.

Id. at 2040.

In light of the above, it is apparent that Jones's counsel abandoned his attempt to present this evidence and did not preserve the issue for appeal. See Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010) (observing that a pretrial motion does not preserve an error

17

for appellate review; the defendant must also make a contemporaneous objection to the admission of the evidence during the trial).

We also reject Jones's claim that the trial court's ruling on the motion in limine amounted to fundamental error. Appellant's Br. p. 19. Indeed, the fundamental error exception is extremely narrow. Boesch v. State, 778 N.E.2d 1276, 1279 (Ind. 2002). Fundamental error occurs only when the error "constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." Id. In other words, to qualify as fundamental error, the error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. Clay v. State, 766 N.E.2d 33, 36 (Ind. Ct. App. 2002).

Here, we believe that the trial court acted within its discretion in concluding that Jones's proffered testimony about what Aaron allegedly said to him would not give rise to a reasonable degree of probability of bias and prejudice. In essence, the trial court determined that Jones's proffered evidence lacked any significant probative value. In making this assessment, the trial court relied upon the fact that Jones's alleged animus on Aaron's part over his testimony in Wash's trial was two years old, and the record shows that Aaron and Jones were friendly towards each other before these murders occurred.

The evidence shows that Mills saw Jones and Aaron together near Jones's car at the party, and she testified that "they came back to the party" after leaving at some point. Tr. p. 1130-31. Fuller saw Jones and Aaron playing cards together at the party. Id. at 1157. This evidence supported the trial court's conclusion that Jones's claim of bias on

18

this issue was not credible and lacked probative value. As a result, the trial court appropriately determined that Jones's suggestion of bias was too attenuated to be reasonably probable, and it properly excluded the testimony. Thus, there was no error— let alone fundamental error.

### III. Sufficiency of the Evidence

Jones argues that the evidence was insufficient to support his murder convictions. Specifically, Jones claims that the convictions must be set aside because Aaron's testimony was incredibly dubious, and the State failed to prove that a robbery ever occurred.

In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. Baumgartner v. State, 891 N.E.2d 1131, 1137 (Ind. Ct. App. 2008). Additionally, we will consider only the evidence most favorable to the verdict and all reasonable inferences therefrom. McHenry v. State, 820 N.E.2d 124, 126 (Ind. 2005). We will affirm a defendant's conviction if evidence of probative value exists from which a jury could find the defendant guilty beyond a reasonable doubt. Gray v. State, 871 N.E.2d 408, 416 (Ind. Ct. App. 2007). Reversal is only appropriate when reasonable persons would be unable to form inferences as to each material element of the offense. McCray v. State, 850 N.E.2d 998, 1000 (Ind. Ct. App. 2006).

Jones invokes the "incredible dubiosity" rule and claims that we should reweigh Aaron's testimony. The "incredible dubiosity" rule provides:

19

> If a sole witness presents inherently improbable testimony and there is a complete lack of circumstantial evidence, a defendant's conviction may be reversed. This is appropriate only where the court has confronted inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. Application of this rule is rare and the standard to be applied is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it.

Love v. State, 761 N.E.2d 806, 810 (Ind. 2002).

As noted above, Jones was charged with four counts of felony murder pursuant to Indiana Code section 35-42-1-1. Regarding each count, the State was required to prove beyond a reasonable doubt that Jones: (1) knowingly or intentionally; (2) killed each of the four victims in this case; (3) while committing or attempting to commit robbery. Appellant's App. p. 215-16.

Although Jones contends that we should reweigh Aaron's testimony, none of the characteristics of the incredible dubiosity rule are triggered. First, while Aaron may have been the only eyewitness to the murders, there was other testimony and circumstantial evidence that removed his testimony from the scope of review under the incredible dubiosity rule. More specifically, the State's evidence included testimony that Aaron, Jones, and Parks all attended Goldsby's party. Tr. p. 1127. Jones told Aaron about the opportunity to rob McClendon of $6000 and some drugs, and there are cell phone records showing that Jones called McClendon on the night of the murders. State's Exs. 218, 219. Mills saw Jones's vehicle outside the party while he, Aaron, and Parks were standing near it, and Fuller saw that Jones was carrying a handgun in his waistband at the party.

20

The type of handgun was consistent with one of the weapons that had been fired at the Polk Street residence. Tr. p. 1159-60, 1862, 1198, 1129-30, 1159, 1203, 1510, 1643, State's Exs. 110-19. There was also testimony from Fuller and Dixon concerning the purchase of the AK-47 for Parks. Id. at 1150-51, 1488-89; State's Exs. 211, 212. Lewis testified at his deposition that he was there when the AK-47 was fired and that he saw his brother with that type of weapon. Tr. p. 975-76, 986, 987. Fuller presented corroborating testimony that Lewis was present when the AK-47 was being fired at Brandy's residence. Id. at 1152.

Additionally, ballistic evidence showing that the same AK-47 that fired the rounds collected at Brandy's and Dixon's had fired the rounds that were collected at the murder scene. Moreover, Jones's asserted alibi was refuted, and there was evidence demonstrating that Jones had threatened Alexander's life when she failed to support his alibi. The evidence further showed that Jones may have disposed of a handgun in a drainage ditch, and there was substantial evidence showing that Jones had financial distress that would support a motive to rob McClendon. Id. at 1584, 1590-92, 1609-10, 1651-54, 1659, 1671, 1888-90.

In sum, we conclude that the incredible dubiosity rule does not apply in this instance and that the evidence presented at trial was more than sufficient to support Jones's convictions.

21

CONCLUSION

In light of our discussion above, we conclude that the trial court did not admit improper hearsay evidence at trial and that Jones's right to confront the witnesses against him was not violated. We also find that the trial court properly excluded evidence of alleged bias by Aaron against Jones and that the evidence was sufficient to support Jones's convictions.

The judgment of the trial court is affirmed.

ROBB, C.J., and BRADFORD, J., concur.