

FILED
May 30 2012, 8:42 am

CLERK
of the supreme court,
court of appeals and
tax court

# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**MICHELLE MARQUAND**
Indiana Dept. of Child Services
Jeffersonville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF D.K., a MINOR CHILD, and his MOTHER, <br><br> O.K., <br><br>     Appellant-Respondent, <br><br>          vs. <br><br> INDIANA DEPARTMENT OF CHILD SERVICES, <br><br>     Appellee-Petitioner, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     No. 22A01-1110-JT-485 <br> ) <br> ) <br> ) <br> ) <br> ) |

APPEAL FROM THE FLOYD CIRCUIT COURT
The Honorable John Terrence Cody, Judge
Cause No. 22C01-1007-JT-250

**May 30, 2012**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

O.K. ("Mother") appeals the trial court's termination of her parental rights to her son, D.K. We affirm.

## Issue

The sole restated issue before us is whether there is sufficient evidence to support the termination of Mother's parental rights.

## Facts

D.K. was born in October 2008. D.K.'s father, K.F. ("Father"), has never financially supported D.K. and was incarcerated after his birth. On March 30, 2009, the Floyd County office of the Department of Child Services ("DCS") removed D.K. from Mother's care and placed him in foster care after it substantiated a report of neglect. Mother was attending a court hearing regarding eviction from her apartment when DCS came to the residence and found D.K. in the care of an unrelated person—apparently a boyfriend who was not Father—who was asleep. Additionally, there was a lack of proper food and clothing in the residence.[1]

D.K. was adjudicated a child in need of services ("CHINS") on April 7, 2009. As part of the CHINS dispositional order, Mother was ordered to participate in parenting skills education, attend visitation, and obtain stable housing and employment. Over the course of the next two years, Mother lived in at least eight different residences. She lived

---

[1] DCS provides many more details regarding what it allegedly found at this time regarding O.K.'s care but we do not relate them here, for reasons we discuss later in this opinion. The facts we have stated regarding D.K.'s removal come from testimony at the termination of parental rights hearing and a finding in the trial court's termination order, which Mother does not challenge.

with friends, relatives, and boyfriends during this time period. The court appointed special advocate ("CASA") assigned to the case often had trouble locating or contacting Mother because of her frequent moves.

Mother's work history during the CHINS proceedings consisted of a part-time minimum wage position at Dairy Queen for eight months, employment at another restaurant for one Christmas season, and full-time at a Kroger grocery store in Louisville, Kentucky for two months. Mother quit her job at Kroger after one of her frequent moves because she did not have transportation to that job, which had been provided by an ex-boyfriend's mother.

Mother never completed any of the required parenting classes, nor did she complete her GED, although it had been recommended that she do so. In August 2009, D.K. was placed in Mother's custody at a group home. However, Mother was removed from the group home program in November 2009, for violating rules against having boyfriends spend the night there and possessing alcohol. D.K. then was returned to foster care. Mother was aware of the rules and was aware of the consequences for breaking them. When Mother lived in Louisville, DCS offered to look into the possibility of arranging for an Interstate Compact for Placement of Children to have D.K. live with Mother, but Mother declined to cooperate in that process.

On January 5, 2011, the trial court held a hearing with respect to terminating Father's parental rights to D.K., and it did in fact terminate his parental rights thereafter.[2] Prior to this hearing, Mother had indicated she might be willing to voluntarily terminate her parental rights and consent to D.K.'s adoption by the foster parents, but she stated at this hearing that she was not willing to so consent. The trial court did not consider evidence related to termination of Mother's parental rights at this time.

After this hearing, DCS agreed to reinitiate services for Mother and referred her to a service provider. However, Mother cancelled her scheduled initial meeting with a counselor at the service provider and also failed to show up at the rescheduled meeting. The service provider thereafter terminated its referral for Mother due to non-compliance.

The DCS filed an amended petition to terminate Mother's parental rights on March 23, 2011. The trial court conducted a hearing on the petition on July 15, 2011. Evidence was presented that D.K. is doing very well in his current foster care placement and that the foster family wishes to adopt him. Mother was unemployed at the time of the hearing, although she testified that she would be moving into a new apartment the following week, with the assistance of her father and a boyfriend, and presented evidence that she had paid a deposit toward that apartment. On September 20, 2011, the trial court entered its order terminating Mother's parental rights to D.K. Mother now appeals.

---

[2] Father does not appeal this determination.

4

**Analysis**

Before turning to the merits of this appeal, we wish to discuss an evidentiary matter that could have impeded our review of the case. At the outset of the termination hearing, DCS requested that the trial court take judicial notice of the underlying CHINS proceedings and the trial court agreed to do so. Additionally, in its brief DCS relates facts that apparently are based on documents filed in the CHINS action, namely a "Preliminary Inquiry" and a "Motion to Modify the Dispositional Decree." Appellee's Br. pp. 4-5. These facts are not supported by any evidence actually introduced at the termination of parental rights ("TPR") hearing. Moreover, neither party provided these cited documents, or any documents from the CHINS proceedings, to us in an appendix.

Until recently, the general rule in Indiana was that "a trial court may not take judicial notice <u>even of its own records</u> in another case previously before the court on a related subject with related parties." <u>Gray v. State</u>, 871 N.E.2d 408, 413 (Ind. Ct. App. 2007), <u>trans. denied</u>. However, effective January 1, 2010, Indiana Evidence Rule 201(b) was amended to provide that a court may take judicial notice of "records of a court of this state . . . ." Thus, the trial court here did not err in taking judicial notice of the CHINS proceedings at the outset of the TPR hearing.

Still, we have noted, in the context of a post-conviction relief ("PCR") hearing, the problems that the revision to Rule 201(b) can present for appellate review. In <u>Graham v. State</u>, 941 N.E.2d 1091, 1097 (Ind. Ct. App. 2011), <u>aff'd on reh'g</u>, 947 N.E.2d 962 (Ind. Ct. App. 2011), the post-conviction court indicated that it was going to take judicial

5

notice of the record of the underlying criminal trial, and it did in fact rely on that record in denying the post-conviction relief petition. However, the original trial record was not made part of the post-conviction record on appeal. We stated in our original opinion, "regardless of the rules regarding judicial notice, any material relied upon by a trial court in deciding a case should be made part of the record for appeal purposes." Graham, 941 N.E.2d at 1097 n.2. On rehearing, we further explained:

> [I]f a PCR court does in fact, on its own initiative or at the request of a party, take judicial notice of other court records in ruling upon a PCR petition, those records should be made part of the PCR record. . . . We also emphasize that if a PCR court purports to take judicial notice of other court records and relies upon those records in ruling upon a PCR petition, but those records are not made part of the PCR record, it places a substantial burden upon this court on appeal to either track down those records and have them transmitted to this court, or to attempt to decide the case without benefit of those records.

Graham, 947 N.E.2d at 964-65.

TPR cases are similar to PCR cases in that they often must refer to and rely heavily upon records in different, but related, proceedings, i.e., a CHINS proceeding in a TPR case and an original criminal trial in a PCR case. In that respect, what we noted in Graham applies equally here, and in fact in any situation where a trial court takes judicial notice of records of another court proceeding in deciding a case. Evidence Rule 201(b) now allows trial courts to take judicial notice of records of other court proceedings, but if a court does so, there must be some effort made to include such "other" records in the

6

record of the current proceeding.[3]  Furthermore, if a party on appeal wishes to rely on parts of the "other" record or records in making an argument before this court, it should include those parts in an appendix submitted to this court under Indiana Appellate Rule 50.

Here, it would have aided our appellate review if DCS had provided us with copies of documents it was relying upon in its appellate brief, particularly those indicating the conditions that initially led to D.K.'s removal from Mother's care. Nonetheless, we have determined that we are able to adequately review the arguments in this case and will proceed to do so.

"When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences most favorable to the judgment. Id. "We must also give 'due regard' to the trial court's unique opportunity to judge the credibility of the witnesses." Id. (quoting Indiana Trial Rule 52(A)). Where a trial court enters findings of fact and conclusions thereon, as the trial court did here, we apply a two-tiered standard of review. Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id. We will set aside the trial court's judgment only if it is clearly erroneous, which occurs if

---

[3] We note that the other matters of law of which a trial court take judicial notice under Evidence Rule 201(b) include decisional, constitutional, and statutory law, rules of court, published agency regulations, codified ordinances, and laws of other governmental subdivisions of the United States or of any state, territory, or other jurisdiction of the United States. These types of matters are equally accessible by trial and appellate courts, or by the general public for that matter. By contrast, we have very limited access to, in this instance, the content of filings located in Floyd County.

7

the findings do not support the trial court's conclusions or the conclusions do not support the judgment.  Id.

A petition to terminate a parent-child relationship must allege:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

8

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[4]  DCS has the burden of proving these allegations by clear and convincing evidence.  I.A., 934 N.E.2d at 1133.

Of the factors listed in Section 31-35-2-4(b)(2)(B), the trial court based the termination of Mother's parental rights solely on the basis that the conditions that led to D.K.'s removal and placement outside Mother's home would not be remedied.  On appeal, Mother challenges only that finding.  She does not allege that an insufficient amount of time had passed before termination, or that termination is not in D.K.'s best interests, or that there is not a satisfactory plan for his care and treatment.

When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions.  In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied.  Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent.  In re A.I., 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), trans. denied.  The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.

---

[4] Minor changes to this statute, none of which would be relevant here, are set to take effect on July 1, 2012.  See Ind. P.L. 48-2012 § 66.

9

McBride v. Monroe County Office of Family and Children, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services. Id. "Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." Id.

The reason for D.K.'s initial removal from Mother's care was neglect related to him being left with an inappropriate caregiver and there being a lack of appropriate food and clothing in the residence. Additionally, Mother was on the verge of being evicted from that residence when DCS investigated the neglect report. We also note that although D.K. was placed back in Mother's care and custody while she resided at a group home, she was unable to maintain custody of D.K. because she willingly did not comply with certain rules of the home. Mother later had the possibility of caring for D.K. again when she lived in Louisville, but she declined DCS's offer to help make those arrangements.

There is clear and convincing evidence that the conditions that led to D.K.'s initial removal and continued placement outside of Mother's care would not be remedied. In over two years, Mother never completed any of the recommendations or requirements of the CHINS dispositional order. She never completed a required parenting class, despite being given multiple opportunities to do so. She also failed to maintain a stable residence, having lived in no fewer than eight places during the two years of the CHINS

10

proceedings. Even at the TPR hearing, Mother did not seem to comprehend the importance of a stable residence, testifying, "I don't stay in one place, to be honest." Tr. p. 34. She also testified that she frequently stayed with friends for periods of a few weeks at a time, but she did not consider such stays as actually living with that person. Mother's residential instability made it difficult for the CASA to keep track of her.

Mother also squandered her opportunity to reunite with D.K. while living at the group home with him. Instead of focusing on completing parenting classes while there and doing what needed to be done to permanently reunite with her son, she instead, as she admitted in her testimony, knowingly violated rules of the home related to alcohol possession and having boyfriends spend the night. This indicates that Mother was more concerned with her own desires than with D.K.'s welfare. Mother also demonstrated a lack of interest in D.K. when she declined assistance in arranging to live with him while in Louisville.

Mother points to evidence that she was preparing to move into an apartment shortly after the TPR hearing as evidence that she was remedying the conditions that led to D.K.'s removal. We cannot agree that this evidence by itself, even if undisputed, is sufficient to reverse the trial court's judgment. It is a parent's habitual pattern of conduct that must be considered in determining whether to terminate parental rights, and a trial court is not required to accept evidence of a last-minute change in conditions as trumping evidence of years of a different pattern of behavior. Mother's living situation had been highly unstable for over two years and, simply put, there was no guarantee that her move

11

into the new apartment would last any longer than any of her previous living situations. This is especially true, given that Mother was unemployed at the time of the TPR hearing, as she had been for much of the CHINS proceedings. Mother never obtained her GED. She also had to quit the best job she had—the full-time position at Kroger—because of her continued residential instability, i.e., she moved too far away from the store and transportation became a problem.

In sum, there is ample evidence that Mother took little to no steps to correct the problems that led to D.K.'s removal and continued placement outside her care. Even after she was given a "second chance" at not having her parental rights terminated following the January 2011 hearing, she failed to take even the initial step of meeting with the service provider counselor. The trial court's finding that there was a reasonable probability that the conditions leading to D.K.'s removal would not be remedied was not clearly erroneous.

## Conclusion

There is sufficient evidence to support the termination of Mother's parental rights. We affirm.

Affirmed.

FRIEDLANDER, J., and MAY, J., concur.