**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 19 2012, 8:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT FATHER:

**THOMAS C. ALLEN**
Fort Wayne, Indiana

ATTORNEY FOR APPELLANT MOTHER:

**DEBORAH A. VIAN**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS, Central Administration
Indianapolis, Indiana

**MICHAEL SPECIALE**
DCS, Allen County Office
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENT-CHILD RELATIONSHIP OF S.B., Minor Child | ) ) ) ) |
| and | ) ) |
| B.B., Mother, <br> Appellant, | ) ) ) |
| and | ) ) No. 02A03-1202-JT-74 |
| D.B., Father, <br> Appellant, | ) ) ) |
| vs. | ) ) ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee. | ) ) |

APPEAL FROM ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D08-1104-JT-64

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

D.B. ("Father") and B.B. ("Mother") appeal the involuntary termination of their parental rights to their child, S.B., claiming there is insufficient evidence to support the juvenile court's judgment. We affirm.

**Facts and Procedural History**

Father and Mother are the biological parents of S.B., born in April 2010. The facts most favorable to the juvenile court's judgment reveal that following S.B.'s birth, the Allen County office of the Indiana Department of Child Services ("DCS") was notified that S.B. showed signs of drug withdrawal shortly after birth. During DCS's ensuing assessment, Mother told the DCS case manager, Sara Fuller, that she had used Xanax and other prescription medications while pregnant to avoid "self-medicating with illegal drugs." Tr. p. 292. Mother further admitted that she had used cocaine in the past.

On April 28, 2010, Fuller asked Mother and Father to submit to drug screens. Father refused to participate, but Mother submitted to the test. The test results showed that Mother had oxycodone in her system. When Fuller subsequently discussed the results with Mother, Mother could not provide Fuller with a prescription for that drug and refused to grant Fuller permission to access her pharmacy records. Mother also refused to consent to any further drug tests. In addition, Mother told Fuller that Father had committed domestic battery against her in the past and had been incarcerated for it.

Fuller also learned that two of Mother's other children had been subjects of a prior DCS investigation, and Mother's sister had been granted custody of those children. Father, Mother, and S.B. were living with Father's mother, Deborah Heraldo.

On May 19, 2010, DCS filed a petition asking the juvenile court to determine that S.B. is a child in need of services ("CHINS"). On May 26, 2010, the court held a hearing and determined that probable cause existed to conclude that S.B. is a CHINS. During the same hearing, the juvenile court advised Father and Mother of their rights, and they denied the allegations in DCS's petition. Next, the court appointed a special advocate ("CASA") to represent S.B.'s interests. Finally, the juvenile court ordered Father and Mother to comply with the following requirements:

1. Refrain from all criminal activity;
2. Maintain clean, safe, and appropriate sustainable housing at all times;
3. Notify [DCS] within forty-eight (48) hours of all changes in household composition, housing, and employment;
4. Cooperate with all caseworkers, the Guardian Ad Litem and/or CASA, by attending all case conferences as directed; maintaining contact, and accepting announced and unannounced home visits;
5. Immediately provide the caseworkers with accurate information regarding paternity, finances, insurance, and family history;
6. Immediately provide the caseworkers and Mental Health Specialist with signed and current consents of release and exchange of information;
7. Provide the child(ren) with clean, appropriate clothing at all times and;
8. Fully cooperate with all rules of the child(ren)'s placement.

State's Ex. 5, pp. 2-3. In addition, the juvenile court ordered Father and Mother to "submit to random urinalysis testing, drug screens, and/or oral swabs as required by the

3

[DCS] caseworkers and refrain from the use of alcohol, illegal drugs, and other substance abuse." Id. at 3. The court determined that S.B. would remain in Father and Mother's custody if they continued to reside with Heraldo.

Fuller asked Father and Mother to submit to a drug screen immediately after the hearing on May 26, 2010. Father and Mother both conceded that the test results would indicate the presence "of cocaine and possibly marijuana." Tr. p. 296. Indeed, the results showed cocaine in both parents' systems, along with methamphetamine. Father also tested positive for marijuana.

DCS removed S.B. from Father and Mother's care after receiving the drug test results and notified the juvenile court. On June 4, 2010, the court held a detention hearing and determined that S.B. should be placed in licensed foster care. On June 16, 2010, the court determined that Father and Mother were indigent and appointed attorneys for them.

On June 29, 2010, the parties appeared for an additional initial hearing, which was also a dispositional hearing. At the hearing, Father and Mother admitted to several of the allegations in DCS's CHINS petition. Specifically, Father and Mother admitted that S.B. showed withdrawal symptoms, including tremors, shortly after birth. They also admitted that Father had battered Mother in the past and had a conviction for domestic battery upon Mother. In addition, they conceded that Father refused to submit to a drug screen on April 28, 2010. Mother, but not Father, admitted that prior allegations of child neglect had been substantiated against her in 2003, when another of her children was found to be

4

a drug-exposed infant, and in 2007, when she tested positive for marijuana and overdosed on morphine. Mother also conceded that her April 28, 2010 drug screen tested positive for oxycodone, which was inconsistent with the medicines that she had disclosed at the time of the test. Finally, Mother, but not Father, agreed that Father became angry when hospital staff stated that S.B. needed to go to the Neonatal Intensive Care Unit and that he threatened to take S.B. and Mother out of the hospital against medical advice. Based on Father and Mother's admissions, the court determined that S.B. was a CHINS and ordered that S.B. be kept in licensed foster care. The court issued a parent participation plan, in which it ordered Father and Mother to continue to comply with the conditions of the May 26, 2010 order as set forth above. In addition, the court ordered Father and Mother to "[o]btain a family functioning assessment and follow the recommendations." State's Ex. 10, p. 3.

On July 6, 2010, following a hearing, the juvenile court amended the parent participation plan. The court ordered Father and Mother to continue to comply with the conditions of the May 26, 2010 order as set forth above. In addition, the court ordered Mother to comply with the following conditions:

9. Obtain a drug and alcohol assessment at Phoenix Associates by July 16, 2010, and follow all recommendations of the assessment.
10. Obtain a family functioning assessment and follow the recommendations.
11. Submit to random urinalysis testing, drug screens, and/or oral swabs as required by the Department of Child Services caseworkers and refrain from use of alcohol, illegal drugs, and other substance abuse.
12. Attend and appropriately participate in all visits with your child as directed.

5

13. Enroll in individual/family counseling at Phoenix Associates or an approved licensed agency by July 16, 2010, attend all sessions, and successfully complete the counseling program.

14. Obtain all prescriptions from the same pharmacy.

State's Ex. 12, p. 1. The court ordered Father to comply with the same conditions as those imposed upon Mother, except that instead of obtaining a family functioning assessment, Father was ordered to obtain a psychological assessment at Park Center by July 16, 2010, and follow the recommendations. Furthermore, the court did not require Father to obtain all prescriptions from the same pharmacy. On July 12, 2010, the court also ordered Mother to obtain a psychological assessment at Park Center.

Subsequently, Father and Mother went to Park Center for psychological evaluation. Park Center's staff recommended that Father complete a substance abuse treatment program, parenting classes, and individual and couples therapy. The staff also recommended that Mother complete a substance abuse treatment program. Next, Father and Mother went to Phoenix Associates and submitted to a substance abuse assessment. However, they did not return to Phoenix for treatment, and Phoenix closed their case files. On September 30, 2010, DCS referred Father and Mother to Caring About People ("CAP") for substance abuse treatment. Father submitted to an initial assessment but refused to participate in further services. Mother submitted to an initial assessment and began a seventy-two-hour counseling program, but she had attendance problems. During this time period, Father and Mother failed several drug screens. Father repeatedly tested

6

positive for cocaine, and Mother tested positive for cocaine and methamphetamine several times.

The juvenile court held a review hearing on October 25, 2010, and issued an order. The court determined that Father and Mother have "not demonstrated an ability to benefit from services" and that they were "in non-compliance with the Parent Participation Plan." State's Ex. 14, p. 2. Consequently, the court ordered that S.B. remain in foster care.

Father was arrested on two separate occasions in November 2010. In one case, the State charged Father with possession of a controlled substance, possession of marijuana, operating a vehicle while intoxicated in a manner endangering a person, and operating a vehicle with an alcohol concentration equivalent to at least .08. Father subsequently pleaded guilty to the first three charges and the State dismissed the fourth. In a second case, the State charged Father with two counts of resisting law enforcement and one count of criminal mischief. Father pleaded guilty to one count of resisting law enforcement, and the State dismissed the other two charges. Father was incarcerated due to these criminal cases from November 26, 2010 until September 24, 2011, when he was released to probation.

Meanwhile, Mother continued to attend substance abuse services at CAP, but her attendance was so poor that CAP ended its services to her on January 26, 2011. DCS subsequently referred Mother to CAP again. Mother tested positive for cocaine on January 13, 2011.

7

On February 23, 2011, the juvenile court held a permanency hearing and issued an order. The court noted that DCS had submitted a permanency plan recommending that Father and Mother's parental rights be terminated and that S.B. be adopted, and the CASA concurred. The court determined that Father and Mother had both failed to refrain from criminal activity, had tested positive for illegal substances, and had not demonstrated an ability to benefit from services. Consequently, the court authorized DCS to file a petition to terminate Father and Mother's parental rights. DCS filed an Amended Petition for Termination of Parental Rights on May 4, 2011.

Although DCS moved forward with the termination of Father and Mother's parental rights, it continued to offer services to Mother in the form of another referral to CAP for substance abuse counseling and individual psychological counseling. Mother continued her pattern of poor attendance, and as a result CAP ended the individual counseling in May 2011 and the substance abuse counseling in July 2011.

An evidentiary hearing on the termination petition commenced on June 13, 2011, and continued on June 14, September 19, September 27, October 3, October 26, and November 9, 2011. During the termination hearing, DCS presented evidence concerning Father and Mother's history of substance abuse, Mother's prior involvement with DCS concerning two of her older children, Father's extensive criminal record, Father and Mother's unstable housing arrangements, and Father and Mother's lack of compliance with services.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. On February 12, 2012, some 20 months after S.B. was first removed, the court entered its judgment terminating Father and Mother's parental rights to S.B. This appeal followed.

**Discussion and Decision**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. In re C.G., 954 N.E.2d 910, 923 (Ind. 2011). However, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a request to terminate parental rights. In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id.

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. C.G., 954 N.E.2d at 923. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Where, as here, the juvenile court enters findings of fact and conclusions of law in its termination of parental rights, our standard of review is two-tiered. In re J.H., 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), trans. denied. First, we determine whether the

9

evidence supports the findings, and second, we determine whether the findings support the judgment. C.G., 954 N.E.2d at 923. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. C.G., 954 N.E.2d at 923.

Before parental rights may be involuntarily terminated, the State is required to allege and prove, in relevant part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B) (2009).[1] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (1997)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter

---

[1] Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (1998) (emphasis added).

Father and Mother both challenge the sufficiency of the evidence supporting the juvenile court's conclusion as to subsection (b)(2)(B) of the termination statute discussed above.[2] We observe that Indiana's termination statute requires the juvenile court to find only one of the three requirements of Indiana Code section 31-35-2-4(b)(2)(B) to be established by clear and convincing evidence. See id. Because we find it to be dispositive under the facts of this case, we only consider whether the evidence submitted at the hearing demonstrates that there is a reasonable probability the conditions resulting in S.B.'s removal or continued placement outside Father and Mother's care will not be remedied. See Ind. Code § 31-35-2-4(b)(2)(B)(i).

In making such a determination, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re D.K., 968 N.E.2d 792, 798 (Ind. Ct. App. 2012). The court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. In re I.A., 903 N.E.2d 146, 154 (Ind. Ct. App. 2009). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to

---

[2] DCS notes that Mother does not challenge any of the juvenile court's findings of fact and further asserts that Father indirectly challenges only one of the juvenile court's findings. DCS concludes that in light of Mother and Father's failure to challenge specific findings, this Court "needs to go no further in its analysis" and may affirm on that basis. Appellee's Br. at 20. We disagree and address the merits of Father and Mother's claims.

11

provide support, and lack of adequate housing and employment. Id. The court may also consider any services that DCS offered to the parent and the parent's response to those services as evidence of whether conditions will be remedied. In re A.B., 924 N.E.2d 666, 670 (Ind. Ct. App. 2012). Moreover, DCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. Id. Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

In this case, in determining that there is a reasonable probability that the reasons for S.B.'s placement outside the home will not be remedied, the juvenile court stated:

> The Respondent Mother has had services provided to her on multiple occasions stemming back to a period of time before the initiation of the underlying CHINS case. She has not successfully maintained sobriety and she has not completed the services required of her under the Dispositional Decree. The Father has not completed drug and alcohol treatment, individual counseling, or parenting classes. Neither parent has demonstrated a commitment to therapeutic treatment that their psychological evaluations deemed necessary for the child to be safely returned to their care. Despite the Department's referrals to different agencies and the extended time that it took to complete the termination factfinding, the parents still had not completed the requisite services.

Appellant Father's App. p. 12.

Here, the juvenile court provided detailed findings of fact discussing Father and Mother's unresolved parenting deficiencies, struggles with substance abuse, and other mental health issues. In so doing, the court noted that S.B. was removed from Father and

12

Mother's care shortly after birth when S.B. displayed symptoms of drug withdrawal. The court further found that Mother had a history of substance abuse problems that caused two of S.B.'s siblings to be removed from her care, that Father and Mother tested positive for illegal substances during the CHINS case, that Father failed to follow up on multiple referrals for substance abuse treatment, anger management, and family counseling, that Mother repeatedly failed to fulfill requirements to attend substance abuse counseling and failed to pursue individual counseling, that Father was incarcerated during portions of the CHINS and termination cases, and that Mother and Father have a history of unstable housing arrangements.

A thorough review of the record leaves us satisfied that clear and convincing evidence supports the juvenile court's findings, which in turn support the court's determination that there is a reasonable probability that the reasons for S.B.'s placement outside the home will not be remedied. We start with the parents' substance abuse problems. When DCS first investigated S.B.'s case due to signs of drug withdrawal, Mother told Fuller that she took Xanax and other drugs during her pregnancy because she believed they would help her avoid using cocaine, which she had previously used. Mother described for Fuller the medicines for which she had a prescription, but her first drug screen revealed the presence of oxycodone, an addictive opiate, which was not among the prescriptions she had listed. She refused to show Fuller her prescription bottles or give Fuller access to her pharmacy records. Fuller subsequently learned that Mother sought and received multiple prescriptions from multiple doctors. As for Father's

13

cooperation on substance abuse issues, when Fuller approached him shortly after S.B.'s birth, he was "combative and angry" and refused to cooperate other than by agreeing not to use illegal drugs. Tr. pp. 292-93.

Father subsequently submitted to numerous court-mandated DCS drug tests during the CHINS case. Father tested positive for cocaine in all but one of those tests. In addition, in October and November 2010, Father submitted to drug screenings administered by CAP. Father failed three of his five drug screens, testing positive for alcohol on three tests, positive for cocaine on two tests, and positive for marijuana on one test. Father was not tested from November 26, 2010 through September 24, 2011, because he was incarcerated.

Mother also submitted to court-mandated DCS drug tests from April 28, 2010 through August 29, 2011. During this period, Mother tested positive for cocaine eight times and tested positive for methamphetamines four times, all prior to February 2011. However, she tested positive for marijuana on August 29, 2011, while this termination case was pending. In addition, a DCS case worker who administered many of the tests asserted that Mother would sometimes disclose prescription medications she was taking but fail to test positive for those medications. Mother would also test positive for prescription medications that she did not disclose prior to the tests. Furthermore, during an August 12, 2011 home visit, a DCS caseworker noted that Mother was taking methadone in larger quantities than prescribed by her doctor. This was a concern because methadone is an opiate derivative that can "put you to sleep." Id. at 476. At the

14

termination hearing, Mother's sister expressed concerns about Mother's past inability to parent due to drug use and excessive sleeping, which had resulted in two of Mother's children being removed from Mother's custody in a prior CHINS case and being placed in her sister's care. Based upon the foregoing evidence, the juvenile reasonably found that Father and Mother tested positive for illegal substances and that Mother had other substance abuse problems during the CHINS proceedings.

Next, the record shows that Father and Mother failed to comply with the juvenile court's instructions to obtain treatment for their substance abuse problems and to address other mental health issues. By way of background, in July 2010, Father submitted to a psychological exam at Park Center. During the exam, he took a number of tests. After the tests, Father was diagnosed with poly-substance dependence, antisocial personality disorder, and adjustment disorder. Dr. Ina Carlson of Park Center stated that the tests revealed that Father feels "extremely stressed" by everyday life and "has a hard time focusing and functioning because of this stress." Id. at 37. The tests further indicated that Father would find it "hard to be empathic and focused on someone other than himself," and that given his problems in dealing with stress, "drugs and alcohol can completely take over what's important." Id. at 41. Park Center's staff recommended that Father complete a substance abuse treatment program, complete parenting classes, and undertake individual and couples therapy. Dr. Carlson noted that if he failed to complete substance abuse treatment, any child in his care would be at "extreme risk" for harm. Id. at 44.

Mother also submitted to a psychological assessment at Park Center. She reported a history of abuse of cocaine, alcohol, and prescription medication, including use of prescription pain killers for "mood . . . stabilization." Id. at 51. Testing revealed that Mother reported many physical ailments, and she "is probably more comfortable focusing on the physical aspects of life rather than being insightful about her own behavior." Id. at 48. Mother was diagnosed with anxiety disorder, cocaine dependence, panic disorder, and major depressive disorder. Dr. Carlson stated that given Mother's history of substance abuse, "it would be highly . . . inappropriate to put a child in her home." Id. at 51. She further stated that if Mother did not successfully complete a substance abuse program, any child in her care would be "at extreme risk" because Mother could not manage a child "on a consistent basis." Id. at 51, 52.

On July 6, 2010, the juvenile court ordered Mother and Father to obtain substance abuse assessments from Phoenix Associates by July 16, 2010, and to "follow all recommendations of the assessment." State's Ex. 12, pp. 1-2. The court further ordered Father and Mother to enroll in individual or family counseling at Phoenix Associates by the same deadline "and successfully complete the counseling program." Id. The family counseling referral was important because Father had a history of domestic violence against Mother. Father and Mother appeared at Phoenix Associates on July 13, 2010, and submitted to the substance abuse assessment. Phoenix subsequently recommended that they attend substance abuse therapy and joint family counseling, and that Father attend

16

anger management classes. However, Father and Mother did not return to Phoenix, and Phoenix closed their cases on October 1, 2010 due to noncompliance.

DCS next referred Father and Mother to CAP for substance abuse treatment on September 30, 2010. Father underwent a drug and alcohol assessment. CAP personnel determined that Father met the criteria for alcohol dependence and cocaine dependence, and they recommended that Father attend a total of seventy-two hours of treatment. Father rejected CAP's proposed treatment plan. Subsequently, Father was incarcerated and unable to participate in services. Thus, CAP discharged Father's referral as unsuccessful on January 25, 2011. Father conceded at the October 26, 2011 termination hearing that he had not completed his counseling at CAP.

Mother submitted to an assessment at CAP following DCS's September 30, 2010 referral. CAP staff characterized the referral as a "re-referral" because Mother had received treatment from CAP for substance abuse in a prior CHINS case, during which she had a poor attendance record at CAP. Tr. p. 123. In the current case, CAP staff determined that Mother met the criteria for cocaine dependence and required her to complete seventy-two hours of substance abuse therapy. Mother subsequently attended five counseling sessions but missed eleven, and CAP closed her referral for poor attendance on January 26, 2011. Mother went back on February 16, 2011, after DCS issued a second referral, and she subsequently attended sixteen sessions of substance abuse treatment but missed eight. During that period, she also received general psychological counseling from CAP, but she missed five sessions and CAP closed out

17

that service on May 31, 2011. Meanwhile, CAP counselor Amy Phan closed out the second substance abuse referral in July 2011 due to poor attendance. Next, DCS referred Mother to CAP for a third time for substance abuse counseling. After Mother failed a drug test for marijuana in August 2011, CAP required Mother to attend twenty additional hours of substance abuse therapy in addition to the remaining hours she needed to complete to meet the original seventy-two-hour requirement. Finally, Phan closed Mother's third referral on September 19, 2011, while the termination case was pending, due to Mother's failure to attend appointments. Mother conceded at the November 9, 2011 termination hearing that she had not fulfilled her substance abuse counseling requirements at CAP.

Mother argues that she was unable to attend counseling on a consistent basis due to transportation issues. However, the record reflects that Mother had a good attendance record for visitation with S.B. The record further reflects that Mother was able to go to various pharmacies to fill her prescriptions. Mother also argues that DCS should have provided her with home-based services, asserting that she could have complied more easily with such services. Mother's arguments are nothing more than a request to reweigh the evidence, which we cannot do.

The foregoing evidence supports the juvenile court's findings that Father failed to follow through on referrals for substance abuse treatment, anger management, and family counseling, and that Mother failed to fulfill substance abuse counseling requirements and to comply with individual counseling requirements.

18

Finally, we turn to the juvenile court's finding that Father and Mother were unable to secure stable housing. By the time of the November 9, 2011 termination hearing, Mother had moved six times since S.B.'s birth, living with Father's mother, Heraldo, on several occasions interspersed with periods of time where she lived with acquaintances. Father and Mother were living with Heraldo again at the time of the final termination hearing, but the record demonstrates that the situation was not stable. On one occasion in 2010 when Father and Mother lived with Heraldo, she called the police because Father was loudly argumentative and would not calm down. She wanted Father to move out at that point. Also, after Father was incarcerated, Heraldo forced Mother to move out because Mother failed a drug screen. Thus, there is ample evidence in the record to support the juvenile court's finding that the parents failed to obtain stable housing during the CHINS case and that the situation was not likely to improve.

Father and Mother both note that reports of their visitations with S.B. were positive and demonstrated that they had bonded with their child. Father also notes that his sister spoke highly of his ability to care for children. However, given Father and Mother's history of substance abuse, their failure to address their substance abuse problems during the CHINS case, and their failure to comply with individual and couples counseling requirements, evidence of their positive interactions with S.B. or other children does not require us to reverse the juvenile court's judgment.

Father argues that upon his release from incarceration during the termination case, he sought employment, obtained transportation, and was maintaining sobriety. As noted

19

earlier, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration both evidence of changed conditions and the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. I.A., 903 N.E.2d at 154. Although Father presented evidence at the November 9, 2011 hearing that he had made positive changes in his life in the month and a half following his release from incarceration, he has a lengthy, habitual pattern of criminal behavior and substance abuse, and he failed to cooperate with DCS's requirements in the CHINS case before his incarceration. It is particularly disturbing that Father committed several criminal offenses and was incarcerated while the CHINS case was pending, at a time when Father should have been working to resolve the problems identified by DCS and the juvenile court. Under these circumstances, the record supports the determination that Father has not made stable, long-lasting changes to his life that would correct the circumstances that led to S.B.'s removal.

In summary, DCS presented clear and convincing evidence to support the juvenile court's findings and ultimate determination that there is a reasonable probability the conditions leading to S.B.'s removal or continued placement outside of Father and Mother's care will not be remedied. For all of the reasons stated above, we affirm the judgment of the juvenile court.

Affirmed.

VAIDIK, J., and BARNES, J., concur.

20