## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 15 2016, 8:33 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| --- | --- |
| Donald E.C. Leicht<br>Kokomo, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Robert J. Henke<br>David E. Corey<br>Deputy Attorneys General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| In the Matter of the Termination of the Parent-Child Relationship of C.S., Mother, and G.G, Father,[1] and K.G. and G.G., Children,<br><br>C.S.,<br><br>*Appellant-Respondent,*<br><br>     v. | February 15, 2016<br><br>Court of Appeals Case No.<br>34A04-1507-JT-847<br><br>Appeal from the<br>Howard Circuit Court<br><br>The Honorable<br>Lynn Murray, Judge<br><br>Trial Court Cause Nos.<br>34C01-1501-JT-5<br>34C01-1501-JT-6 |

---

[1] Father does not participate in this appeal; however, according to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.

Indiana Department of Child
Services,

*Appellee-Petitioner*.

**Kirsch, Judge.**

C.S. ("Mother") appeals the juvenile court's order terminating her parental
rights to her children, K.G. and G.G. (collectively, "the Children"). Mother
raises the following restated issue for our review: whether the juvenile court's
termination order is clearly erroneous.

We affirm.

## Facts and Procedural History

Mother is the biological mother of both K.G., born April 6, 2006, and G.G.,
born April 19, 2007.[2] On February 5, 2013, the Indiana Department of Child
Services ("DCS") received allegations that Mother's home had no heat or
running water, and there were concerns that the family was homeless. On that

---

[2] The juvenile court also terminated the parental rights of the father of the Children, G.G., but he does not
participate in this appeal.

date, the house where the family had been living was condemned, and Mother and the Children were moved to Open Arms Shelter ("Open Arms") in Kokomo, Indiana. On February 8, 2013, Mother was asked to leave Open Arms due to her behavior and failure to follow the rules. DCS removed the Children from Mother's care because Mother and the Children were without suitable housing. At that time, the whereabouts of the father of the Children, G.G. ("Father"), were unknown, and he had not had contact with the Children for years.

On February 11, 2013, DCS filed petitions alleging the Children were children in need of services ("CHINS"). A fact-finding hearing was held on the CHINS petitions on April 8, 2013, and the Children were found to be CHINS on that date. At the dispositional hearing held on April 29, 2013, the juvenile court ordered Mother, in pertinent part, to: (1) attend visitations with the Children, which was dependent on her passing drug screens; (2) not use any drugs or alcohol and submit to random drug screens; (3) complete an intensive outpatient substance abuse treatment program if she tests positive, with such treatment to include relapse prevention; (4) complete a parenting program; (5) demonstrate effective parenting skills; (6) obtain and maintain stable housing; (7) participate in therapy and follow all recommendations; (8) maintain contact with DCS and follow their recommendations. *Appellant's App*. at 77.

After the Children were removed, Mother was homeless for several months, but was allowed to move back to Open Arms. When she moved back into Open Arms, she submitted to a drug screen that later came back positive for

amphetamine, methadone, and methamphetamine. At a subsequent review hearing in January 2014, it was reported that Mother was not participating in drug treatment and had a pattern of doing well for a while and then relapsing on drugs and not participating in services or treatment. At an October 2014 review hearing, it was reported that Mother had tested positive twice for marijuana and once for methamphetamine and that she had not completed any type of intensive substance abuse treatment or relapse services. Since the beginning of 2015, all of Mother's drug screens were positive for marijuana, with the most recent being about a month before the termination hearing. Mother also missed drug screens, which DCS and the juvenile court considered to be positive screens. At a child and family team meeting held on March 19, 2015, Mother stated that she was using marijuana and was not going to stop doing drugs. *Tr.* at 35, 101-02.[3] Mother left the meeting before it was over and did not have any more contact with DCS.

[6] Throughout the length of the case, Mother's visitation with the Children remained supervised, and at times, her visits were suspended. In October 2014, she did not visit the Children because she did not have transportation, but did not request DCS for assistance with transportation. Her visitation was suspended in November 2014 due to her no shows, but visits resumed in

---

[3] Included in the record on appeal are exhibits from each of the Children's underlying CHINS proceedings and transcripts for each of the Children's cases as they were filed under separate cause numbers, 34C01-1501-JT-5 and 34C01-1501-JT-6. The exhibits and transcripts are substantially similar, so for ease of reference, we shall only refer to the materials under 34C01-1501-JT-5.

January 2015 when Mother moved back to Kokomo and transportation was arranged by DCS. Because her visitations with the Children were conditioned upon her submitting to and providing clean drug screens, Mother's visits were suspended at the time of the termination hearing because she had not submitted to a drug screen since March 18, 2015. Since that date, Mother did not contact DCS to reinstate her visitations or to inquire as to the Children's welfare.

[7] Mother's compliance with services was inconsistent throughout the case. In the beginning of the case, Mother made tremendous progress in her home-based services and parent education, but in October 2014, "the bottom kind of fell out for" Mother. *Tr.* at 14. The service provider only had one contact with Mother in November and December 2014. By January 2015, Mother was back to participating in services, but after the March 19, 2015 meeting where Mother walked out, she had no more contact with her service provider.

[8] Mother completed a mental health evaluation in August 2014 and was referred by DCS to both individual and family therapy. Mother never participated in any family therapy. Mother attended individual therapy for a period of time, but later stopped participating. She had at least three different therapy providers, and DCS made the referrals to accommodate her work schedule. Mother completed another mental health assessment on February 25, 2015, and based on its recommendations, DCS again referred Mother to individual therapy, group therapy, and medication management. At the time of the termination hearing, Mother had just begun to go back to therapy about a week prior to the hearing.

[9] Mother's housing situation was inconsistent throughout the case. After the Children were removed, Mother was homeless for several months before moving back to Open Arms. After staying at Open Arms, she moved into a trailer with her friend. Thereafter, Mother moved in with her father in Logansport in October 2014, and while living there, she did not contact DCS or respond to DCS's attempts to contact her. In January 2015, Mother moved back to Kokomo and again stayed in the trailer before moving in with another friend.

[10] In March 2014, Mother began employment at Tyson, but lost that job in October 2014 because she missed too many days. Mother then obtained employment at a cleaning service, but returned to Tyson because she was able to get her job back there two weeks after losing it. She left Tyson in December 2014 because she did not have transportation. At the time of the termination hearing, Mother was working at a pizza restaurant, where she started in February 2015.

[11] During the pendency of this case, Mother had two misdemeanor convictions, both of which were initiated after the commencement of the CHINS action. She was convicted of driving while suspended in November 2014 and of disorderly conduct in February 2015. Mother failed to appear for some of her court hearings associated with these charges and was therefore incarcerated for approximately a week in early 2015.

[12] Shortly after the Children were removed from Mother's care, family case managers ("FCM") met with Mother to discuss behaviors displayed by the Children, including engaging in sexual play, wetting their beds, having bad dreams, and talking about watching scary movies and pornography. At a review hearing held on July 21, 2014, the juvenile court found that when the Children were told that visitation with Mother may soon transition to unsupervised, the Children began exhibiting anxiety and sexualized behaviors. *Appellant's App*. at 81. At a hearing held on January 12, 2015, the juvenile court found that the Children continued to have significant behavioral, psychological, and sexual issues; that K.G. had been to the emergency room several times and was finally admitted to the hospital for suicidal ideations and attempting to harm himself; and that G.G. continued to urinate in the foster home and had begun defecating in the home. After his hospitalization, K.G. returned to the foster home, but was moved to a residential treatment center after threatening the foster mother. G.G. was also moved out of the original foster home and to a different foster home.

[13] On January 5, 2015, DCS filed its petition to terminate Mother's parental rights to the Children. An evidentiary hearing was held on April 20, 2015. At this hearing, the FCM testified that she believed that termination was in the Children's best interests because the Children needed a "stable, consistent environment to grow up in with parents who can provide for them." *Tr.* at 60-61. DCS's plan for the Children was adoption. The court appointed special advocate ("CASA") testified that she also believed that termination was in the

Children's best interests because the Children needed permanency in their life and a stable home. *Id*. at 79. In her report, the CASA stated that Mother had not shown that she was willing to put the Children ahead of her own wants and desires, had chosen a life with drugs over a life with the Children, and had had over two years to work with service providers, but her progress had been slow and had even regressed. On June 8, 2015, the juvenile court issued its order terminating Mother's parental rights. Mother now appeals.

## Discussion and Decision

[14] We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[15] Here, in terminating Mother's parental rights to the Children, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d

143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[16] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[17] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[18] In her argument, Mother does not challenge any of the juvenile court's findings of fact or legal conclusions. In fact, she effectively concedes that the findings of fact are not clearly erroneous when she contends that the termination "may be 'factually correct,'" but it rests on a weak and inherently contradictory foundation. *Appellant's Br.* at 3. As Mother does not challenge any of the juvenile court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were

clearly erroneous), *trans. denied*; *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (when father failed to challenge specific findings, court accepted them as true). Likewise, Mother does not specifically challenge any of the juvenile court's legal conclusions regarding any of the statutory requirements under Indiana Code section 31-35-2-4(b)(2). The failure to challenge the juvenile court's legal conclusions results in the waiver of any argument as to the sufficiency of such findings. *A.D.S.*, 987 N.E.2d at 1156 n.4. Further, Mother does not support any of her contentions with citations to legal authority or cogent argument as required by Indiana Appellate Rule 46(A)(8)(a), and her arguments are, therefore, waived. *See Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App. 2005) (concluding that failure to present cogent argument or citation to authority constitutes waiver of issue for appellate review), *trans. denied.*

[19] However, given our preference for resolving a case on its merits, we will address what appear to be Mother's arguments. In her argument section, Mother makes the statement that, "the overriding issue was always the marijuana." *Appellant's Br*. at 7. In making a decision to terminate parental rights, the juvenile court may consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012), *trans. denied*. Additionally, the court may consider any services offered by DCS to the parent and the parent's response to those services. *Id*. Parental rights may be

terminated when parties are unwilling or unable to meet their parental responsibilities. *In re D.D.*, 804 N.E.2d at 265.

[20] In the present case, although Mother states that her marijuana use was the overriding issue in terminating her parental rights, the juvenile court's determination went beyond her use of marijuana as evidenced by the extensive findings and conclusions made by the court. *Appellant's App.* at 73-93. Further, Mother's marijuana use was a substantial issue in the case due to her multiple failed drug screens and her failure to submit to drug screens. During the pendency of the case, Mother also failed to participate in drug treatment or relapse prevention programs. Because her visitations with the Children were conditioned upon her submitting to and providing clean drug screens, her visits were suspended at the time of the termination hearing because she had not submitted to a drug screen since March 18, 2015. Additionally, at a child and family team meeting on March 19, 2015, just one month before the termination hearing, Mother stated that she was using marijuana and was not going to stop doing drugs. *Tr.* at 35, 101-02. The evidence, therefore, shows that Mother's continued use of marijuana and failure to submit to drug screens and participate in treatment programs was in fact a significant issue in the termination case, and the evidence of such supported the juvenile court's conclusions that the conditions that resulted in the Children's removal or the reasons for placement outside the home of the parents will not be remedied, that the continuation of the parent-child relationship poses a threat to the well-being of the Children, and that termination is in the best interests of the Children.

[21]  Mother further contends that "nationally," the trend is moving towards legalizing marijuana, and "within a few years, . . . a termination like this one will not even occur" in Indiana. *Appellant's Br*. at 8. Marijuana use, however, still remains illegal in Indiana and was so at the time of the termination hearing. More notably, the focus is not on whether Mother's actions were legal or illegal, but instead, on whether Mother is unable or unwilling to take care of the Children as a result of her actions. If Mother's drug of choice was alcohol, which is legal, but still led to her inability to care for the Children and unwillingness to make the changes necessary to have the Children placed back in her care, such use of a legal drug could have led to a CHINS adjudication and termination of her parental rights. Therefore, Mother's focus on the possible future legalization of marijuana is not the proper inquiry as to her continued marijuana use; rather, the proper question is whether her continued use of marijuana causes her to be unable to care for the Children and whether she is unwilling to change to have the Children returned to her care.

[22]  Mother's remaining arguments are simply requests to reweigh the evidence, which we cannot do on appeal. *In re D.D.*, 804 N.E.2d at 265. Although Mother asserts that the foundation for this case was shaky, we disagree. The evidence showed that the Children were removed from Mother's care, not because her apartment had been condemned and they had moved into Open Arms, but because she and the Children had been asked to leave Open Arms due to Mother's behavior and failure to follow the rules. After the Children were found to be CHINS, Mother was ordered, among other things, to: (1)

attend visitations with the Children; (2) not use any drugs or alcohol and submit to random drug screens; (3) complete a substance abuse treatment program, including relapse prevention; (4) complete a parenting program; (5) demonstrate effective parenting skills; (6) obtain and maintain stable housing; and (7) participate in therapy, following all recommendations. However, during the twenty-six months that this case was pending, Mother had multiple positive drug screens for marijuana and methamphetamine, among other drugs, and she also failed to submit to multiple drug screens, which were viewed as being positive screens. Mother failed to ever complete intensive substance abuse treatment or relapse services. Mother's visitations with the Children remained supervised throughout the case, and because her visitations with the Children were conditioned upon her submitting to and providing clean drug screens, visitation was suspended at a point in time because she had stopped submitting to drug screens. Mother's compliance with services was inconsistent throughout the case, and her participation in therapy was likewise inconsistent as she never participated in any family therapy and attended individual therapy for a period of time, but then stopped participating. During the pendency of the case, Mother was homeless for a few months and lived in several different locations, including Open Arms, a trailer with a friend, with her father, and with another friend. At the termination hearing, the FCM and the CASA both testified that termination was in the best interests of the Children because the Children needed permanency in their life and a stable home. Based on this evidence, we conclude that sufficient evidence was presented to prove the statutory requirements under Indiana Code section 31-35-2-4(b)(2).

[23] We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to the Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[24] Affirmed.

[25] Mathias, J., and Brown, J., concur.