**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 24 2013, 6:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**L. MATTHEW NIXON**
Fair, Nixon & Nixon, P.C.
Princeton, Indiana

ATTORNEYS FOR APPELLEE:

**RAYMOND P. DUDLO**
DCS Gibson County Local Office
Princeton, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE TERMINATION OF THE )
PARENT-CHILD RELATIONSHIP OF )
K.C. (Minor Child) and )
)
J.P. (Father), )
)
    Appellant-Respondent, )
)
        vs. )    No. 26A01-1212-JT-555
)
THE INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE GIBSON CIRCUIT COURT
The Honorable Jeffrey F. Meade, Judge
Cause No. 26C01-1204-JT-3

**July 24, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

J.P. ("Father") appeals the trial court's involuntary termination of his parental rights to

his child, K.C. We affirm.

**Facts and Procedural History**

In its termination order, dated November 28, 2012, the trial court made the following

relevant findings of fact:

1.  [K.C.] ("the Child") is a child under the age of 18 years, having been born on February 11, 2011.

2.  The Child's biological mother is [F.C.] ("Mother"). The Mother lives in Princeton, Indiana.

3.  The Child's biological father is [J.P.] ("Father"). The Father lives in Tullahoma, Tennessee.

4.  The Child is the only child born to the Mother and Father. The Child's parents have never married. The Father's paternity of the Child became established in cause number: 26C01-1103-JP-00014.

5.  The Mother voluntarily terminated her parental rights to the Child.

6.  The Department of Child Services ("DCS") had initial involvement with the Child on February 18, 2011. Initial involvement began as an assessment of allegations concerning inappropriate home conditions and the parents being unable or refusing to provide the necessary care and supervision for the Child. Although formal paternity had not been established, the Father was identified as the potential father. During the course of the assessment, and for several months afterwards, the Father provided very little to no support for Child or the Mother. The Child was born premature and with a range of health risks. The Mother had no housing herself and lived with family. That home was dirty and unsafe for the Child. That home was discovered by DCS to be unsanitary with food and feces left out in the open. That home also exhibited a strong smell of urine. The physician at the Child's birth hospital expressed concerns for the Child's return home given her

fragile and susceptible condition.[1]  The Child remained at the birth hospital until her detention by DCS.  While at the hospital, the Mother did not regularly attend to and feed the Child.  The Mother readily admitted that she was not ready to be a parent and planned on the Child's maternal grandmother assuming care of the Child.  This assessment concluded in a substantiation of neglect for the Mother.  The result of the assessment led to the detention of the Child on February 18, 2011, only seven days after the Child's birth.  The Child was placed with foster care and then later returned to the Mother's care.  The Child was not placed with the Father.

7.  Upon the Child's removal, a detention hearing was timely held on February 21, 2011.  DCS also petitioned the Child become a CHINS.  A guardian ad litem was appointed to the case.  The Mother was appointed counsel and the matter was continued.  At that continued date, the Mother admitted that the Child is a Child In Need of Services in accordance with I.C. 31-34-1-1 and a dispositional hearing was set.

8.  A dispositional hearing was held on behalf of the Mother and the child on March 17, 2011.  [J.P.], who at the time was an alleged father, was present for this hearing.

9.  Under the subsequent Dispositional Decree, entered on April 14, 2011, the Child's placement continued inside the home with the Mother and outside the care of any alleged father.

10.  On April 28, 2011, paternity was formally established on behalf of [J.P.], under cause number 26C01-1103-JP-00014 for the Child.

11.  Unfortunately, the Child continued to suffer from a lack of necessary supervision of either parent.  Consequently, on June 8, 2011, DCS detained the Child and placed her within foster care.  A subsequent detention hearing was held on June 10, 2011.  On August 22, 2011, a dispositional hearing was held on behalf of the Mother and Father.  At that hearing, the Father agreed to additional services and signed a Parental Participation Plan that was made an order of this Court.

---

[1] K.C. was diagnosed with Marfan Syndrome on July 25, 2012.  The record indicates that Marfan Syndrome is a genetic heart disorder that K.C. inherited from Mother.  Tr. at 11, 35-36.

12. On September 27, 2011, under Dispositional Decree, the Child's placement outside of her parents' care continued. The Child has since remained in foster care under this Dispositional Decree.

13. Dispositional, review, and permanency hearings were held in the CHINS matter as required by law, and the parents attended most hearings. The Father was appointed counsel upon request on January 26, 2012. The Father attended the majority of court hearings, and the hearings in which he did not attend his appointed counsel was present. The Father received notice of the Termination of Parental Rights trial and was present with counsel.

14. Throughout the duration of the underlying CHINS case, the Father never enjoyed placement with the Child. The Child has remained outside the home and care of her Father throughout the entire involvement of DCS under cause number: 26C01-1102-JC-00023. Since the date of the June 8, 2011 removal, the Child has remained with the foster care parents that intend on pursuing adoption. The Child has spent most of her life with her foster care family instead of her biological parents.

15. The Mother remained the primary custodial parent until she furnished her voluntary termination of parental rights to this Court. At no time did the Father seek placement or custody of the Child.

16. DCS offered the Father regular parenting time with the Child, but the Father did not take advantage of this important opportunity. Since establishing his paternity, the Father only visited with the Child four times. Over the course of the underlying CHINS case, the Father only visited with the Child for a total of eight hours. The Father never went beyond supervised parenting time with the Child during the entire duration of the underlying CHINS case.

17. The Father did not pursue services in a manner which indicates his intent to bring about change. Services with the Father were suspended for lack of compliance. Opportunities the Father said he would pursue in his home state were never pursued. Except for attending the scheduled hearings in the CHINS and termination matters, the Father did not comply with this Court or DCS. The Father made no meaningful attempt to establish a relationship with the Child. The Father made no meaningful attempt to seek placement, reunification, or custody with the Child.

18. The Child lives with the foster care parents who intend to adopt the child if parental rights are terminated. The foster care parents love and care for the child. The foster care parents have provided the child with a safe and suitable home. The foster care family, as a potential adopting family, offers the child permanency which she greatly needs.

19. The Guardian Ad Litem (GAL) believes that adoption is in the best interests of the Child. The GAL recommends this Court terminate the parental rights of the Father.

20. A Petition to terminate parental rights was filed on behalf of the child, [K.C.] on March 12, 2012.

21. Termination of parental rights is in the best interests of the Child. It is notable to the Court that Father made no meaningful attempt to establish a relationship with the Child. The Court finds the Father's limited contact with the Child to be a significant indicator of the Father's lack of bond with the child and his lack of positive participation in the Child's life.

22. The plan of care for the child if parental rights are terminated is adoption. The foster parents are willing to adopt the Child in the event that parental rights are terminated. If for some reason, this family would be unable to adopt after termination of parental rights, another adoptive placement would be located. Adoption would provide the Child with the safety and stability that she did not have while in the care of her biological parents. The plan of adoption is a satisfactory plan to achieve permanency for the Child.

Appellant's App. 8-12.

Based upon these findings of fact, the trial court concluded that: (1) K.C. has been removed from Mother's and Father's care for at least six months under a dispositional decree; (2) there is a reasonable probability that the conditions that resulted in the removal of K.C. and her continued placement outside the care and custody of Father will not be remedied; (3) there is a reasonable probability that the continuation of the parent-child relationship between Father and K.C. poses a threat to the well-being of K.C.; (4) termination

5

of the parent-child relationship between Father and K.C. is in the best interests of K.C.; and, (5) DCS has a satisfactory plan for the care and treatment of K.C., and such plan is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and therefore terminated Father's parental rights. Father now appeals. We will state additional facts in our discussion where necessary.

## Discussion and Decision

"The purpose of terminating parental rights is not to punish parents but to protect their children. Although parental rights have a constitutional dimension, the law allows for their termination when parties are unable or unwilling to meet their responsibility as parents." *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004) (citation omitted). Indeed, parental interests "must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009).

Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:[2]

(2) The petition must allege:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required,

---

[2] Indiana Code Section 31-35-2-4 was amended slightly effective July 1, 2012. We refer to the version of the statute in effect at the time DCS filed its termination petition on March 12, 2012.

6

including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *G.Y.*, 904 N.E.2d at 1261; Ind. Code § 31-37-14-2. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences favorable to the trial court's judgment. *Id.* Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of

7

review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. Clear error is that which "leaves us with a definite and firm conviction that a mistake has been made." *J.M. v. Marion Cnty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied.*

## *I. Due Process*

Father first asserts that he was denied fundamental fairness and due process because DCS did not provide reunification services to him, never considered him for placement of K.C., and failed to provide services to facilitate placement with him. We initially observe that while Father's arguments regarding reunification and placement services may have been appropriately raised in the CHINS proceeding, these arguments are not appropriate in termination proceedings. Although DCS is generally required to make reasonable efforts to preserve and reunify families during CHINS proceedings, *see* Ind. Code § 31-34-21-5.5, DCS is not required to provide reunification services during termination proceedings and failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law. *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009).

Moreover, we reject Father's bald assertion that he was never considered for placement of K.C. or that no services were ever offered to facilitate such placement. During the pendency of the CHINS proceeding, Father was ordered to obtain appropriate housing, maintain a clean and healthy home environment, attend parenting classes, participate in

8

supervised visitation with K.C., and maintain contact with the family case manager. Appellee's Ex. A at 53. The record indicates that Father did not complete parenting classes, he visited with K.C. for a total of only eight hours over the course of seventy-seven weeks, failed to maintain contact with the family case manager, and never spoke with the family case manager about wanting K.C. to live with him. In essence, Father exhibited no interest in parenting K.C. Under the circumstances, Father has not shown how he was denied fundamental fairness or due process.

## II. Conclusions of Law

Father next challenges the trial court's conclusions of law that: (1) there is a reasonable probability that the conditions that resulted in K.C.'s removal and continued placement outside his care and custody will not be remedied; and, (2) there is a reasonable probability that continuation of the parent-child relationship between him and K.C. poses a threat to K.C.'s well-being. Specifically, Father contends that the trial court's conclusions do not comply with Indiana Code Section 31-35-2-4 because they are "mere recitations" of statutory language and provide no explanation as to which of the trial court's findings of fact support the conclusions. Appellant's Br. at 10.

Father correctly notes that Indiana Code Section 31-35-2-8(c) requires the trial court, when terminating parental rights, to enter "findings of fact that support the entry of the conclusions… ." Here, the trial court entered twenty-two findings of fact to support its conclusions. Despite these detailed findings of fact, Father seems to complain merely that the trial court's conclusions themselves do not provide an explanation of which of the findings of

9

fact support the conclusions. Father cites no authority, as there is none, that requires the trial court's conclusions to contain an explanation as to which factual findings support them. Father has failed to make a cogent argument on this issue and, therefore, has waived our review. *See* Ind. Appellate Rule 46(A)(8)(a) (issues must be supported by cogent reasoning and each contention must be supported by citation to authority or to the record).

### III.  Reasonable Probability that Conditions will not be Remedied

In addition to challenging the trial court's recitation of the two above mentioned conclusions of law, Father also challenges the sufficiency of the evidence supporting those conclusions. We observe that Indiana Code Section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied* (2000), *cert. denied* (2002). Therefore, finding it to be dispositive, we limit our review to Father's challenge to whether DCS presented clear and convincing evidence establishing that there is a reasonable probability that the conditions that resulted in K.C.'s removal and continued placement outside his care and custody will not be remedied. This Court has said,

> When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. Additionally, a court may consider not only the basis for a child's initial removal from the parent's care, but also any reasons for a child's continued placement away from the parent. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Additionally, the

10

court may consider any services offered by the DCS to the parent and the parent's response to those services. Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination.

*In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012) (citations and quotation marks omitted).

Here, following her removal from Mother's home, K.C. has spent her young life in foster care and has never resided with Father. It is clear from the record that Father was offered regular parenting time with K.C. so that he could form a relationship with her, but he routinely failed to take advantage of that opportunity. Father visited with K.C. a mere four times, for a total of eight hours, over the course of seventy-seven weeks, claiming that gas was too expensive for him to make the trip to Indiana. While Father was encouraged to seek out and attend parenting classes in his home state of Tennessee, Father failed to do so claiming he did not have the fifty dollars necessary to enroll. The family case manager directed Father to the local DCS office in Tennessee to inquire about free parenting classes, but Father never followed up with this suggestion.

In addition, despite being specifically ordered to maintain contact with the family case manager to stay apprised of K.C.'s well-being, Father did not maintain any consistent contact, reporting that he was "too busy" applying for disability benefits to get in contact with the case manager. Tr. at 92. Indeed, Father admitted that, because he had spent such little time with K.C. and had not inquired about her well-being, he was wholly unaware that K.C.'s medical condition had caused various developmental delays requiring intense therapy.

Father did not know that K.C. cannot say any words and that she wears braces on her legs to assist her with walking. *Id.* at 40-42.

In a case like this, where the child has never resided with the parent, we focus on the conditions that led to DCS's retention of custody when considering whether there is a reasonable probability that those conditions will be remedied. *In re W.B.*, 772 N.E.2d 522, 530 (Ind. Ct. App. 2002). DCS retained custody of K.C. due to Father's habitual pattern of conduct which evidenced an unwillingness to make any attempt to form a meaningful relationship with K.C. or to positively participate in her life. The record before us is replete with evidence supporting the trial court's conclusion that there is a reasonable probability that there will be no impending change to the conditions that resulted in K.C.'s continued placement outside Father's custody and care. Father's argument to the contrary is merely an invitation for us to reweigh the evidence, which we cannot do. *See D.B.*, 942 N.E.2d at 871.

Father maintains that the trial court erroneously used his poverty as the basis for the termination of his parental rights. We agree that poverty itself is not a proper basis for the termination of parental rights. However, "[w]hile the fact that [a parent] is of low or inconsistent income of itself does not show unfitness, if the poverty causes him to neglect the needs of his [child] or expose his [child] to danger, then the [child's] removal is warranted." *In re B.D.J.*, 728 N.E.2d 195, 202 (Ind. Ct. App. 2000). Although "'[p]overty can be a crushing burden … [] poverty cannot excuse child neglect or abuse. Nor can it excuse the total lack of an attempt to remedy the situation to meet even the most minimal standards of acceptable child care.'" *Id.* (quoting trial court).

The trial court here did not cite poverty as a basis for termination of Father's parental rights. Rather, the court cited Father's demonstrated unwillingness to participate in visitation or parenting services as well as his failure to make a meaningful attempt to establish a relationship with K.C. as the bases for the termination of his parental relationship with K.C.[3] The trial court was not persuaded by Father's use of his poverty to excuse his behavior regarding K.C. and, as stated above, poverty cannot excuse Father's total lack of an attempt to remedy the situation that led to K.C.'s continued placement outside of his care and custody. Father has shown no error in this regard.

Under the circumstances, the trial court did not err in concluding that there was a reasonable probability that the conditions leading to K.C.'s continued placement outside the care and custody of Father will not be remedied. In sum, the trial court's termination of Father's parental rights to K.C. was not clearly erroneous based upon the record presented. We therefore affirm the trial court's judgment.

Affirmed.

ROBB, C.J., and FRIEDLANDER, J., concur.

---

[3] While Father attempted to use his lack of income as an excuse for failing to visit with K.C. or to participate in parenting services, the record indicates that Father declined to seek free services despite being encouraged to do so by the family case manager. Additionally, Father has continued to not visit with K.C. and not participate in services notwithstanding his recent monthly receipt of disability income. Tr. at 25.