# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 21 2020, 10:33 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan T. Feavel
Feavel & Porter, LLP
Vincennes, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of C.Q. (Minor Child)

and

K.Q. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 21, 2020

Court of Appeals Case No.
20A-JT-1284

Appeal from the Daviess Circuit Court

The Honorable Gregory A. Smith, Judge

Trial Court Cause No.
14C01-2003-JT-53

**Bailey, Judge.**

# Case Summary

[1] K.Q. ("Mother") appeals the termination of her parental rights to C.Q. ("Child"), upon the petition of the Daviess County Department of Child Services ("the DCS").[1] Mother presents a single, consolidated issue for review: whether the termination judgment is clearly erroneous because the DCS failed to establish, by clear and convincing evidence, the requisite statutory elements to support the termination decision. We affirm.

# Facts and Procedural History

[2] In 2010, Mother was diagnosed as a paranoid schizophrenic with a methamphetamine dependency. Mother was prescribed anti-psychotic injections, but was often non-compliant and was, at times, involuntarily committed for mental health treatment. During one such commitment, in September of 2019, Mother went into labor and was taken to a hospital to give birth. She walked through the hallway inappropriately dressed and asked staff if she could leave. Hospital staff then summoned a social worker.

[3] Heather Terwiske, MSW ("Terwiske"), arrived at Mother's hospital room and observed Mother mumbling and apparently responding to hallucinations. Mother advised Terwiske that Mother's psychiatrist was deceased, and Mother

---

[1] Child's father has not been identified; thus, he was not a party to termination proceedings and is not an active party to this appeal.

had attended his funeral. Mother accused Terwiske of using a machete to kill children in the hospital parking lot. Terwiske contacted the DCS. Child was born on September 19, 2019.

[4] On the following day, DCS Family Case Manager Heather Britton ("Britton") interviewed Mother at the hospital. Britton advised Mother that hospital records indicated Mother had tested positive for methamphetamine, amphetamines, benzodiazepines, and opiates, but Mother denied having used any of those substances. Britton was aware that Mother had three older children, removed from her care in 2014 and 2018, and that Mother's parental rights as to those children had been terminated. Britton was also aware that the earlier removals were prompted by Mother's mental health issues and substance abuse. Britton determined that Child should not be released into Mother's custody and arranged emergency foster care. On September 23, 2019, Child was placed in a foster home with one of her older half-siblings.

[5] On December 2, 2019, Child was found to be a Child in Need of Services ("CHINS"). Mother was ordered to maintain contact with the DCS, obtain suitable housing, meet with medical and psychiatric providers, take her medication as recommended, follow any other psychiatric recommendations, and provide drug screens. The DCS offered Mother services, including drug screens, visitation with Child, and a parenting aide. Mother was partially compliant with services, but some visitations were interrupted or ended due to Mother's apparent delusions. On February 27, 2020, the CHINS court conducted a hearing and issued an order that, pursuant to Indiana Code Section

31-34-21-5.6, based upon the history of parental rights terminations, the DCS was no longer required to provide reunification services to Mother.[2] On March 13, 2020, the DCS petitioned to terminate Mother's parental rights as to Child.

On May 14, 2020, the trial court conducted a hearing at which Mother, Mother's service providers, Mother's court-appointed Guardian ad litem ("GAL"), and Child's court-appointed special advocate ("CASA") testified. Dr. Michael Cantwell ("Dr. Cantwell") recounted Mother's psychiatric history, and her limited compliance with the treatment plan, including numerous positive methamphetamine screens; he opined that Mother was unable to care for herself or a child. Jane Melvin, MSW, testified that Mother's therapy had been discontinued because Mother was unable to participate.

Mother's case manager and parenting aide, each of whom had facilitated visitations, described Mother as responding to internal stimuli as opposed to the external cues of Child. Mother's GAL testified that Mother suffered from auditory hallucinations affecting her ability to parent, and the CASA opined that termination of Mother's parental rights was in Child's best interests. Mother testified that she was willing and able to parent Child, notwithstanding her methamphetamine use. Mother opined that Child's foster parents were

---

[2] Pursuant to Indiana Code Section 31-34-21-5.6(b)(4), reunification services are not required when "the parental rights of a parent with respect to a biological or adoptive sibling of a child who is a child in need of services have been involuntarily terminated[.]" Here, Mother has not challenged the statutory-based order as contrary to law or unsupported by sufficient evidence. She has, at most, implicitly argued that there could have been a different outcome in termination proceedings had she been provided with services for a longer period of time.

unfit, in part because they were using false identities with documentation stolen from the Army records of Mother's father.

[8] On June 8, 2020, the trial court entered an order terminating Mother's parental rights as to Child. Mother now appeals.

# Discussion and Decision

## Standard of Review – Sufficiency of the Evidence

[9] When we review whether the termination of parental rights is appropriate, we will not reweigh the evidence or judge witness credibility. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016). We will consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* In so doing, we give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010) (citing Indiana Trial Rule 52(A)). We will set aside the trial court's judgment only if it is clearly erroneous. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). In order to determine whether a judgment terminating parental rights is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *I.A.*, 934 N.E.2d at 1132.

## Requirements for Involuntary Termination of Parental Rights

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). Although parental rights are of a constitutional dimension, the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). The State is required to prove that termination is appropriate by a showing of clear and convincing evidence, a higher burden than establishing a mere preponderance. *In re V.A.*, 51 N.E.3d at 1144.

Indiana Code Section 31-35-2-4(b)(2) sets out the elements that the DCS must allege and prove by clear and convincing evidence to terminate a parent-child relationship:

> (A)   that one (1) of the following is true:
>
> (i)   The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> (ii)   A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>
> (iii)   The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from

the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore the court need only to find that one of the three requirements of subsection (b)(2)(B) was established by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999).

## Analysis

Mother contends that insufficient evidence supports the termination decision. First, she focuses upon whether there is clear and convincing evidence of a reasonable probability that she would fail to remedy the conditions that led to Child's removal. According to Mother, "at no point did she completely fail to comply with the recommended steps toward reunification." Appellant's Brief at 11.

[13]    An argument as to remediation of conditions invokes a "two-step analysis." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). First, we identify the conditions that led to removal; and second, we must determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge parental fitness as of the time of the termination hearing, taking into consideration the evidence of changed conditions. *Id.* (citing *Bester*, 839 N.E.2d at 152). The trial court is entrusted with balancing a parent's recent improvements against habitual patterns of conduct. *Id.* The trial court has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[14]    Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider the services offered to the parent by the DCS and the parent's response to those services as evidence of whether conditions will be remedied. *In re D.K.*, 968 N.E.2d 792, 798 (Ind. Ct. App. 2012).

[15]    Child was removed from Mother's care because Mother appeared to be delusional and tested positive for illegal substances at Child's birth. Britton, who initiated the removal, had been involved with Mother since 2014 and was aware of Mother's long history of substance abuse and non-compliance with

mental health treatment. Also, Mother's parental rights to three older children had been terminated.

[16] The testimony before the trial court painted a bleak picture of Mother's prospects for recovery. Dr. Cantwell testified that Mother had been given anti-psychotic injections, often through involuntary commitments. However, in his opinion, Mother was so non-compliant with her treatment plan that it was "impossible to treat her without keeping her hospitalized," something which could not be done, and "amphetamines can hasten the deterioration of [her] ability to function." (Tr. at 13, 16.) Dr. Cantwell described Mother as verbally aggressive, prone to auditory hallucinations, and unable to provide self-care. In Dr. Cantwell's opinion, Mother's condition affected her judgment relative to assessing a child's needs, and he particularly noted a lack of response to social cues, impaired expectations, and lack of concentration.

[17] Parenting aide Jessica Patton ("Patton") testified that she attempted to assist Mother with basic tasks. On one occasion, Patton accompanied Mother to the Samaritan Center to sign some paperwork, but Mother insisted upon leaving because she was convinced that her boyfriend was engaged in sexual activity with another woman while he waited for Mother in his vehicle. Mother rushed into traffic and was nearly hit by a vehicle. Patton observed that Mother talked to herself and "to the air." (Tr. at 64.) Mother attended less than half the scheduled sessions and Patton ultimately opined that none of the goals were met.

[18] Britton testified that Mother had attended more than half of the scheduled visitations with Child. Mother sometimes appeared distracted from Child and would scratch off lottery tickets or use her phone. Typically, Mother appeared to respond to internal stimuli instead of interacting with Child. Mother spoke to dead relatives as if they were alive. She would at times perceive danger and become agitated. She expressed fear that someone with a sexual disease was too close to her and Child and she accused Britton of killing babies. Once, Mother had "swung around," with Child in her arms, to "ward off" a perceived threat, and Mother had twice punched a chair. (Tr. at 96.) Sometimes Mother was given a break to go outside; at times, visitation was terminated. Britton did not observe bonding between Mother and Child.

[19] Britton also related some of Mother's expressed concerns about Child's foster parents and Child's health. Without a medical basis, Mother feared that Child suffered from sickle cell anemia and impetigo. Mother had reported to the DCS that the foster parents were using aliases and were engaged in human trafficking. Mother had insisted that the foster mother had a history of beating children and locking them in closets. Mother's testimony at the hearing relayed some of these same concerns. She claimed to "have highly contagious sickle cell from having impetigo so long" and thus had "wondered" if Child "had the same." (Tr. at 184.) She also claimed to have known the foster parents, whom she described as "unfit," for "her whole life." (*Id.* at 157.) Mother apparently believed that the foster mother's true name was "English," and she was using a stolen Social Security number. (*Id.*)

[20] The CASA testified that she had seen no improvement in Mother's mental health over the years, nor had she observed Mother make progress in addressing her substance abuse issues. The GAL opined that Mother had been semi-compliant with services offered by the Samaritan Center but acknowledged that Mother continued to suffer auditory hallucinations.

[21] The witnesses, including those appointed to represent the interests of Child and Mother, were uniform in their assessment that Mother's mental instability and substance abuse were likely to continue. Indeed, Mother did not testify that she intended to take additional steps to remedy the conditions leading to removal. Rather, Mother testified that she could effectively parent notwithstanding her continued use of methamphetamine. Mother also offered that she might receive parenting assistance from her father and claimed that she was "married since the bank filed a pardon on me." (*Id.* at 153.)

[22] On appeal, Mother argues that "the testimony and exhibits show her ability and willingness to comply with recommendations." Appellant's Brief at 15. This is merely a request to reweigh the evidence, an invitation we decline. The DCS presented clear and convincing evidence to establish a reasonable probability that the conditions leading to removal would not be remedied.

[23] Mother also contends that the DCS failed to present clear and convincing evidence that termination is in Child's best interests. In determining what is in a child's best interests, the court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. Mother's

GAL testified that Mother continued to be delusional. The CASA testified that Child had been placed, since birth, in a foster home with her half-sibling. The CASA believed that Child was thriving in her placement and had formed a bond with her foster parents and siblings. Child's foster parents wished to adopt her. Both the CASA and Child's caseworker opined that termination of Mother's parental rights was in Child's best interests. Service providers, including Mother's psychiatrist, testified to Mother's lack of progress in addressing her substance abuse. Considering Child's successful placement, the opinions of appointed advocates and service providers, Mother's long history of non-compliance, and her continued insistence that she need not discontinue methamphetamine use, the DCS presented ample evidence that termination of parental rights was in Child's best interests.

# Conclusion

The DCS established by clear and convincing evidence the requisite elements to support the termination of parental rights. Accordingly, the termination judgment is not clearly erroneous.

Affirmed.

Robb, J., and Tavitas, J., concur.